[No. 50601–9. En Banc. January 11, 1985.]

ELMER E. SHORTER, as Personal Representative, Appellant, v. ROBERT E. DRURY, ET AL, Respondents.

*Davies, Roberts, Reid, Anderson & Wacker,* by *Denny Anderson,* for appellant.

*Williams, Lanza, Kastner & Gibbs,* by *Mary H. Spillane,* for respondents.

DOLLIVER, J.—This is an appeal from a wrongful death

medical malpractice action arising out of the bleeding death of a hospital patient who, for religious reasons, refused a blood transfusion. Plaintiff, the deceased's husband and personal representative, appeals the trial court's judgment on the verdict in which the jury reduced plaintiff's wrongful death damages by 75 percent based on an assumption of risk by the Shorters that Mrs. Shorter would die from bleeding. The defendant doctor appeals the judgment alleging that a plaintiff–signed hospital release form completely barred the wrongful death action. Alternatively, defendant asks that we affirm the trial court's judgment on the verdict. Defendant does not appeal the special verdict in which the jury found the defendant negligent.

The deceased, Doreen Shorter, was a Jehovah's Witness, as is her surviving husband, Elmer Shorter. Jehovah's Witnesses are prohibited by their religious doctrine from receiving blood transfusions.

Doreen Shorter became pregnant late in the summer of 1979. In October of 1979, she consulted with the defendant, Dr. Robert E. Drury, a family practitioner. Dr. Drury diagnosed Mrs. Shorter as having had a "missed abortion". A missed abortion occurs when the fetus dies and the uterus fails to discharge it.

When a fetus dies, it is medically prudent to evacuate the uterus in order to guard against infection. To cleanse the uterus, Dr. Shorter recommended a "dilation and curettage" (D and C). There are three alternative ways to perform this operation. The first is with a curette, a metal instrument which has a sharp–edged hoop on the end of it. The second, commonly used in an abortion, involves the use of a suction device. The third alternative is by use of vaginal suppositories containing prostaglandin, a chemical that causes artificial labor contractions. Dr. Drury chose to use curettes.

Although the D and C is a routine medical procedure, there is a risk of bleeding. Each of the three principal methods for performing the D and C presented, to a varying degree, the risk of bleeding. The record below reflects

that the curette method which Dr. Drury selected posed the highest degree of puncture–caused bleeding risk due to the sharpness of the instrument. The record also reflects, however, that no matter how the D and C is performed, there is always the possibility of blood loss.

Dr. Drury described the D and C procedure to Mr. and Mrs. Shorter. He advised her there was a possibility of bleeding and perforation of the uterus. Dr. Drury did not discuss any alternate methods in which the D and C may be performed. Examination of Mr. Shorter at trial revealed he was aware that the D and C posed the possibility, albeit remote, of internal bleeding.

The day before she was scheduled to receive the D and C from Dr. Drury, Mrs. Shorter sought a second opinion from Dr. Alan Ott. Mrs. Shorter advised Dr. Ott of Dr. Drury's intention to perform the D and C. She told Dr. Ott she was a Jehovah's Witness. Although he confirmed the D and C was the appropriate treatment, Dr. Ott did not discuss with Mrs. Shorter the particular method which should be used to perform it. He did, however, advise Mrs. Shorter that "she could certainly bleed during the procedure" and at trial confirmed she was aware of that possibility. Dr. Ott testified Mrs. Shorter responded to his warning by saying "she had faith in the Lord and that things would work out . . ."

At approximately 6 a.m. on November 30, Mrs. Shorter was accompanied by her husband to Everett General Hospital. At the hospital the Shorters signed the following form (underlining after heading indicates blanks in form which were completed in handwriting):

GENERAL HOSPITAL OF EVERETT
REFUSAL TO PERMIT BLOOD TRANSFUSION
Date November 30, 79 Hour 6:15 a.m.
I request that no blood or blood derivatives be administered to
Doreen V. Shorter
during this hospitalization. I hereby release the hospital, its personnel, and the attending physician from any

responsibility whatever for unfavorable reactions or any untoward results due to my refusal to permit the use of blood or its derivatives and I fully understand the possible consequences of such refusal on my part.

[/s/ Doreen Shorter]
Patient
[/s/ Elmer Shorter]
Patient's Husband or Wife

The operation did not go smoothly. Approximately 1 hour after surgery, Mrs. Shorter began to bleed internally and go into shock. Emergency exploratory surgery conducted by other surgeons revealed Dr. Drury had severely lacerated Mrs. Shorter's uterus when he was probing with the curette.

Mrs. Shorter began to bleed profusely. She continued to refuse to authorize a transfusion despite repeated warnings by the doctors she would likely die due to blood loss. Mrs. Shorter was coherent at the time she refused to accept blood. While the surgeons repaired Mrs. Shorter's perforated uterus and abdomen, Dr. Drury and several other doctors pleaded with Mr. Shorter to permit them to transfuse blood into Mrs. Shorter. He likewise refused. Mrs. Shorter bled to death. Doctors for both parties agreed a transfusion in substantial probability would have saved Doreen Shorter's life.

Mr. Shorter thereafter brought this wrongful death action alleging Dr. Drury's negligence proximately caused Mrs. Shorter's death; the complaint did not allege a survival cause of action. The release was admitted into evidence over plaintiff's objection. Plaintiff took exception to jury instructions numbered 13 and 13A which dealt with assumption of the risk.

The jury found Dr. Drury negligent and that his negligence was "a proximate cause of the death of Doreen Shorter". Damages were found to be $412,000. The jury determined, however, that Mr. and/or Mrs. Shorter "knowingly and voluntarily" assumed the risk of bleeding to death and attributed 75 percent of the fault for her death

to her and her husband's refusal to authorize or accept a blood transfusion. Plaintiff was awarded judgment of $103,000. Both parties moved for judgment notwithstanding the verdict. The trial court denied both motions. Plaintiff appealed and defendant cross–appealed to the Court of Appeals, which certified the case pursuant to RCW 2.06-.030(d).

The three issues before us concern the admissibility of the "Refusal To Permit Blood Transfusion" (refusal); whether assumption of the risk is a valid defense and if so, whether there is sufficient evidence for the jury to have found the risk was assumed by the Shorters; and whether the submission of the issue of assumption of the risk to the jury violated the free exercise clause of the First Amendment. The finding of negligence by Dr. Drury is not appealed by defendant.

I

Plaintiff argues the purpose of the refusal was only to release the defendant doctor from liability for not transfusing blood into Mrs. Shorter had she required blood during the course of a nonnegligently performed operation. He further asserts the refusal as it applies to the present case violates public policy since it would release Dr. Drury from the consequences of his negligence.

Defendant concedes a survival action filed on behalf of Mrs. Shorter for her negligently inflicted injuries would not be barred by the refusal since enforcement would violate public policy. Defendant argues, however, the refusal does not release the doctor for his negligence but only for the consequences arising out of Mrs. Shorter's voluntary refusal to accept blood, which in this case was death.

While the rule announced by this court is that contracts against liability for negligence are valid except in those cases where the public interest is involved (*McCutcheon v. United Homes Corp.,* 79 Wn.2d 443, 486 P.2d 1093 (1971)), the refusal does not address the negligence of Dr. Drury. This being so it cannot be considered as a release from lia-

bility for negligence. *Cf. Hewitt v. Miller,* 11 Wn. App. 72, 521 P.2d 244 (1974). Whether a release which specifically absolved Dr. Drury from his negligence would have been valid or against public policy need not be decided and we reserve any comment on that issue. *See Blide v. Rainier Mountaineering, Inc.,* 30 Wn. App. 571, 573–74, 636 P.2d 492 (1981); *Tunkl v. Regents of Univ. of Cal.,* 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33 (1963); Annot., *Validity and Construction of Contract Exempting Hospital or Doctor From Liability for Negligence to Patient,* 6 A.L.R.3d 704, 705 (1966 & Supp. 1984).

Plaintiff categorizes the refusal as an all or nothing instrument. He claims that if it is a release of liability for negligence it is void as against public policy and if it is a release of liability where a transfusion is required because of nonnegligent treatment then it is irrelevant. We have already stated the document cannot be considered as a release from liability for negligence. The document is more, however, than a simple declaration that the signer would refuse blood only if there was no negligence by Dr. Drury. It is a specific request that no blood or blood derivatives be administered to Mrs. Shorter. The attending physician is released from "*any responsibility whatever* for unfavorable reactions or *any untoward results* due to my refusal to permit the use of blood or its derivatives." (Italics ours.) The release signed by the Shorters further stated: "I fully understand the possible consequences of such refusal on my part."

We find the refusal to be valid. There was sufficient evidence for the jury to find it was not signed unwittingly but rather voluntarily. *See Baker v. Seattle,* 79 Wn.2d 198, 484 P.2d 405 (1971); Restatement (Second) of Torts § 496B (1965). The record shows Dr. Ott advised Mrs. Shorter that her refusal to accept a transfusion could place her life in jeopardy if she bled from a D and C. Dr. Ott further testified there was a risk of bleeding with a routine D and C and that if she then refused a transfusion she might die. Specifically, Dr. Ott stated he advised Mrs. Shorter that if a

perforation occurred at the time of the D and C she would be in grave jeopardy. He also stated Mrs. Shorter said she knew this but remained firm in her conviction to refuse a blood transfusion. Knowing this, and in response to their religious beliefs, the Shorters signed the refusal. In refusing a blood transfusion, the Shorters were acting under the compulsion of circumstances. The compulsion, however, was created by the religious convictions of the Shorters not by the tortious conduct of defendant. *See* Restatement (Second) of Torts § 496E, comments *b, d* (1965).

We also held the release was not against public policy. We emphasize again the release did not exculpate Dr. Drury from his negligence in performing the surgery. Rather, it was an agreement that Mrs. Shorter should receive no blood or blood derivatives. The cases cited by defendant, *Tunkl v. Regents of Univ. of Cal., supra; Colton v. New York Hosp.,* 98 Misc. 2d 957, 414 N.Y.S.2d 866 (1979); *Olson v. Molzen,* 558 S.W.2d 429 (Tenn. 1977), all refer to exculpatory clauses which release a physician or hospital from all liability for negligence. The Shorters specifically accepted the risk which might flow from a refusal to accept blood. Given the particular problems faced when a patient on religious grounds refuses to permit necessary or advisable blood transfusions, we believe the use of a release such as signed here is appropriate. *See* Ford, *Refusal of Blood Transfusions by Jehovah's Witnesses,* 10 Cath. Law. 212 (1964). Requiring physicians or hospitals to obtain a court order would be cumbersome and impractical. Furthermore, it might subject the hospital or physician to an action under 42 U.S.C. § 1983. *See Holmes v. Silver Cross Hosp.,* 340 F. Supp. 125 (N.D. Ill. 1972). The alternative of physicians or hospitals refusing to care for Jehovah's Witnesses is repugnant in a society which attempts to make medical care available to all its members.

We believe the procedure used here, the voluntary execution of a document protecting the physician and hospital and the patient, is an appropriate alternative and not contrary to the public interest.

If the refusal is held valid, defendant asserts it acts as a complete bar to plaintiff's wrongful death claim. We disagree. While Mrs. Shorter accepted the consequences resulting from a refusal to receive a blood transfusion, she did not accept the consequences of Dr. Drury's negligence which was, as the jury found, a proximate cause of Mrs. Shorter's death. Defendant was not released from his negligence. We next consider the impact of the doctrine of assumption of the risk on this negligence.

## II

Plaintiff argues the trial court erred in admitting jury instructions 13 and 13A on the ground that assumption of the risk is no longer a recognized defense in Washington, except in products liability. Plaintiff alternatively argues that even if assumption of the risk remains a viable defense, there was no evidence in the present case from which the jury may have found that Mrs. Shorter, in signing the release form, knowingly and voluntarily assumed the risk that Dr. Drury would negligently perform the D and C, proximately causing her death.

Defendant argues the assumption of the risk doctrine remains viable after enactment of the former comparative negligence statute (RCW 4.22) in cases in which the plaintiff expressly, as opposed to impliedly, assumes the risk of the defendant's negligence. He further asserts Mrs. Shorter, when she signed the blood transfusion release, expressly assumed the risk of bleeding to death even though her chances of bleeding to death may have been increased by his negligence.

Jury instruction 13 provided:

Assumption of the risk is conduct on the part of a person claiming injury or damage which is a proximate cause of the injury or damage complained of.

If you find that Mr. or Mrs. Shorter assumed a risk which was a proximate cause of Mrs. Shorter's death, you must determine the degree of such conduct, expressed as a percentage, attributable to Mr. and Mrs. Shorter. . . . Using 100% as to the total combined conduct of the par-

ties (negligence and assumption of the risk) which contributed to the damage to the plaintiff, you must determine what percentage of such conduct is attributable to Mr. or Mrs. Shorter.

Jury instruction 13A provided:

A person who fully understands a risk of harm to himself or a member of his family and who voluntarily submits to such risk under circumstances which manifest his willingness to assume the risk is not entitled to recover for harm within that risk.

In this case Mr. and Mrs. Shorter did not voluntarily assume the risk of negligence by defendant, but did voluntarily assume the risks relating to the refusal of transfusions of blood or blood products.

In *Lyons v. Redding Constr. Co.*, 83 Wn.2d 86, 515 P.2d 821 (1973), decided before the enactment of the comparative negligence statute, we analyzed the assumption of risk doctrine. Plaintiff directs our attention to the following language in *Lyons* in which this court predicted that enactment of the comparative negligence statute would sound the death knell for the defense of assumption of risk.

The decision reached here today has been long–aborning. Somewhat ironically, its effects will be short–lived. The assumption of risk in special and limited situations or contributory negligence on the part of a plaintiff has the effect of denying all recovery regardless of degree of fault. But this *all or nothing result* will be abandoned or changed on April 1, 1974, because the Washington state legislature has recently enacted a comparative negligence statute [RCW 4.22.010, repealed in 1981 (Laws of 1981, ch. 27, p. 112), but in effect at the time of the events leading to this action] . . .

. . . Accordingly, it has been held the effect of the comparative negligence standard shall be to completely abrogate the assumption of risk doctrine as known and applied heretofore.

*Lyons*, at 95–96.

■ Plaintiff misreads *Lyons* in asserting that it abandoned the defense of assumption of risk in toto. The reference of the *Lyons* court to the gloomy future of the assumption of risk doctrine was directed only at the form of

assumption of risk where the plaintiff's conduct is contributorially negligent. This is referred to as "unreasonable assumption of risk". W. Keeton, *Torts* § 68, at 497 (5th ed. 1984) (hereinafter W. Keeton). Other forms of assumption of risk, *e.g.*, those not involving unreasonable plaintiff conduct, were not at issue in *Lyons*.

Courts and commentators have struggled with the issue as to whether and to what extent the defense of "reasonable" assumption of risk survives the enactment of comparative negligence statutes. *See* W. Keeton § 68, at 495 n.54 (citing commentators); Annot., *Effect of Adoption of Comparative Negligence Rules on Assumption of Risk,* 16 A.L.R.4th 700, 711 (1982). To determine whether the giving of the assumption of risk jury instruction was error, the type of risk the Shorters are alleged to have assumed must be identified.

Prosser classifies the forms of assumption of risk as follows: express, implied primary, implied reasonable, and implied unreasonable. W. Keeton § 68, at 496. It is not argued the Shorters' conduct in assuming the risk is not "implied unreasonable" assumption of the risk; nor do we need to determine whether "implied primary" or "implied reasonable" assumption of risk survived the comparative negligence statute. *See* W. Keeton § 68, at 496–98. We confine our analysis to the validity of express assumption of risk and the extent to which it applies in the circumstances of this case.

Express assumption of the risk is a defense when:

> [T]he plaintiff, in advance, has given his *express* consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone.

W. Keeton § 68, at 480. Jurisdictions with comparative negligence statutes have generally held that the defense of express assumption of the risk survives the enactment of these statutes. V. Schwartz, *Comparative Negligence* § 9.2, at 159 (1974 & Supp. 1981) (hereinafter V. Schwartz). *See,*

*e.g., Keegan v. Anchor Inns, Inc.*, 606 F.2d 35 (3d Cir. 1979); *Blackburn v. Dorta*, 348 So. 2d 287 (Fla. 1977); *Thompson v. Weaver*, 277 Or. 299, 560 P.2d 620 (1977); *Polsky v. Levine*, 73 Wis. 2d 547, 243 N.W.2d 503 (1976). Even jurisdictions whose comparative negligence statutes expressly incorporate assumption of the risk have upheld express assumption of risk. *Becker v. Beaverton Sch. Dist. 48*, 25 Or. App. 879, 551 P.2d 498 (1976); *Wilson v. Gordon*, 354 A.2d 398 (Me. 1976) (dicta). *But see Lamphear v. State*, 91 A.D.2d 791, 458 N.Y.S.2d 71 (1982).

Former RCW 4.22.010 does not expressly state it abolishes the assumption of risk doctrine; it only mentions "contributory negligence". Express assumption of the risk, however, is not "negligence". It is merely a form of waiver or consent. W. Keeton § 68, at 496. *Keegan v. Anchor Inns, Inc., supra.* We hold the doctrine of express assumption of risk survived the enactment of the comparative negligence statute, RCW 4.22.010, and is applicable in Washington. *See Lyons v. Redding Constr. Co.*, 83 Wn.2d 86, 95, 515 P.2d 821 (1973).

> The doctrine, assumption of risk, will, in the Prosser [W. Prosser, *Torts* § 68 (4th ed. 1971)] idiom, have retained validity where there is an *express* agreement to assume, *or* the plaintiff has assumed a risk with knowledge of willful, wanton, or reckless negligence of the defendant.

(Italics in original omitted. Italics ours.) *Lyons,* at 95. *See Klein v. R.D. Werner Co.*, 98 Wn.2d 316, 319, 654 P.2d 94 (1982). *See also* V. Schwartz; W. Keeton § 68, at 496.

■ The next question is whether the Shorters could be found by the jury to have expressly assumed the risk that Dr. Drury's performance of the D and C could be negligent, thereby increasing Mrs. Shorter's chances of bleeding to death. For a person expressly to assume the risk of another's conduct, that person must have knowledge of the risk, appreciate and understand its nature, and voluntarily choose to incur it. W. Keeton § 68, at 486–87; *Martin v. Kidwiler*, 71 Wn.2d 47, 49, 426 P.2d 489 (1967). The test is a subjective one: Whether the plaintiff in fact understood

the risk; not whether the reasonable person of ordinary prudence would comprehend the risk. *Martin v. Kidwiler, supra.* We find the record contains sufficient evidence from which a jury could have concluded the Shorters understood and expressly assumed the risk of bleeding to death as a result of Dr. Drury's negligence.

The general rule is that for persons to assume a risk, they must be aware of more than just the generalized risk of their activities; there must be proof they knew of and appreciated the specific hazard which caused the injury. *See Runnings v. Ford Motor Co.,* 461 F.2d 1145, 1148 (9th Cir. 1972); *Garcia v. South Tucson,* 131 Ariz. 315, 640 P.2d 1117 (Ct. App. 1981). From this rule, plaintiff argues that while he and his wife were aware of the generalized risk of bleeding to death, they did not understand Mrs. Shorter's chances of bleeding to death would be greatly increased by Dr. Drury's negligence. The Shorters, however, did not merely assume a "generalized risk". They assumed the specific risk that Mrs. Shorter might die from bleeding if she refused to permit a blood transfusion. *See Simpson v. May,* 5 Wn. App. 214, 486 P.2d 336 (1971).

The Shorters signed the refusal which stated that they waived professional liability for "unfavorable reactions" or "untoward results" due to Mrs. Shorter's refusal to permit the use of blood. Mrs. Shorter consulted with Drs. Drury and Ott, both of whom advised her that the D and C, even if nonnegligently performed, could result in fatal bleeding. Furthermore, the Shorters were repeatedly advised Mrs. Shorter was bleeding and that without a transfusion her death was imminent.

 Plaintiff calls our attention to the common law principle that a person cannot assume the risk of another's negligence. *See, e.g., Regan v. Seattle,* 76 Wn.2d 501, 458 P.2d 12 (1969) (driver of "go–cart" on race course does not assume extraordinary risk that there may be spilled water on the course); *Wood v. Postelthwaite,* 6 Wn. App. 885, 496 P.2d 988 (1972) (golfer does not assume extraordinary, unforeseen risk of being hit by golf ball due to inadequate

warning but may assume other risks inherent in the game), *aff'd,* 82 Wn.2d 387, 510 P.2d 1109 (1973). While we do not question the rule, we disagree with plaintiff's assertion that it applies in this case.

The defendants do not argue, nor do we hold, that the Shorters assumed the risk of the "direct consequences" of Dr. Drury's negligence. Those "consequences" would be recoverable in a survival action under RCW 4.20.046, .050, and .060. Defendants argue, however, and we agree, that the Shorters could be found by the jury to have assumed the risk of death from an operation which had to be performed without blood transfusions and where blood could not be administered under any circumstances including where the doctor made what would otherwise have been correctable surgical mistake. The risk of death from a failure to receive a transfusion to which the Shorters exposed themselves was created by, and must be allocated to, the Shorters themselves.

The case of *Mainfort v. Giannestras,* 49 Ohio Op. 440, 111 N.E.2d 692 (C.P. 1951) is on point. In *Mainfort,* the plaintiff, a diabetic, consulted with the defendant doctor regarding an operation to lengthen his leg. The doctor explained the operation was particularly risky, due to the possibility that a bone infection might result from the diabetes. The doctor alleged he advised the plaintiff the operation was risky, for the above reasons, "notwithstanding that said treatment and operation would be done in strict and full accord with approved and proper medical methods and practices . . .". *Mainfort,* at 441. The plaintiff nevertheless consented. The doctor performed the operation negligently and the plaintiff's diabetic condition aggravated the doctor's negligence. Although it acknowledged that plaintiff did not assume the risk of the negligently performed operation, the court upheld the assumption of risk defense to the extent it barred negligence damages accruing to the plaintiff's diabetic conditions. The court held:

[The assumption of risk defense] is strictly confined to the consequences growing out of the diabetic condition, which condition, and the risks it attached to the operation, is alleged to have been fully made known to the plaintiff by the defendant before the plaintiff consented to the operation.

*Mainfort,* at 442.

Mr. and Mrs. Shorter did not assume the risk of the negligence. The risk they did assume was the risk of death as the consequence of their refusal to permit a blood transfusion.

## III

■ Finally, plaintiff asserts the submission of the issue of assumption of the risk to the jury violated the free exercise clause of the First Amendment. Plaintiff concedes he has found no cases involving the effect of a patient's refusal of blood in a malpractice action. Nevertheless, plaintiff claims error in the refusal of the trial court to give his proposed instruction 24 which would have told the jury compensation could not be denied because of a refusal of blood for religious reasons. While the Supreme Court has stated the free exercise clause of the First Amendment forbids the "state condition[ing] receipt of an important benefit upon conduct proscribed by a religious faith . . .", *Thomas v. Review Bd.,* 450 U.S. 707, 717, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981), a prerequisite for First Amendment cases is that there be some state action or interference. *Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963); *Thomas v. Review Bd., supra.* There is none here. This is a dispute between private individuals; plaintiff is denied no rights under the First Amendment.

To summarize: The refusal was properly placed before the jury; the instructions on assumption of the risk were not in error and the issue was properly before the jury; there was no violation of the free exercise clause of the First Amendment.

Affirmed.

WILLIAMS, C.J., DIMMICK and ANDERSEN, JJ., and CUN-NINGHAM, J. Pro Tem., concur.

PEARSON, J. (dissenting)—The majority holds the Shorters did not assume the risk of Dr. Drury's negligence. I fully agree. The refusal form did not specifically state that Dr. Drury was released from damages resulting from his negligence, nor is there evidence the Shorters were specifically aware of the precise nature and extent of possible injury. *See* Restatement (Second) of Torts § 496B, comments *b, d* (1965); *Colton v. New York Hosp.*, 98 Misc. 2d 957, 414 N.Y.S.2d 866 (1979); *Martin v. Kidwiler*, 71 Wn.2d 47, 426 P.2d 489 (1967).

The majority further holds the Shorters assumed the risk of death at the point where Dr. Drury's negligence created a life–threatening situation; that holding is tantamount to a holding that the Shorters assumed the risk of Dr. Drury's negligence. Thus, the majority seeks to accomplish its desired result through an analysis that attempts to mask its real effect: substantially excusing the doctor from liability for his negligence. I do not agree with this analysis or result. I therefore dissent.

The majority's holding necessarily decides the Shorters assumed the risk of death from refusal to take blood, *no matter how the necessity for blood arose.* I would agree that if the necessity for blood resulted from the nonnegligent performance of the procedure, the Shorters assumed the risk of death resulting from their refusal to take blood. *See Colton v. New York Hosp., supra.* But, if the need for blood arose from the doctor's negligence, the majority would hold the Shorters still assumed the risk of death resulting from their refusal to take blood. Unlike the majority, I see a significant difference between the two scenarios.

The risk of excessive bleeding inherent in the nonnegligent performance of the procedure was increased by the

Shorters' refusal to take blood; that is a risk properly allocated to the Shorters. The refusal form signed by the Shorters represents their assent to relieve Dr. Drury of his duty to administer blood if required by the nonnegligent performance of the procedure. Mr. Shorter testified that such was his understanding at the time the procedure was performed. If Dr. Drury had performed the operation without negligence, but Mrs. Shorter had bled to death anyway, the doctor could not be held liable in this case.

However, the *additional* risk of bleeding to death created by the doctor's negligence is not a risk that should be allocated to the Shorters. If the Shorters are held to have assumed the risk of death from refusing blood, even when the blood was required because the doctor was negligent, that is in effect holding that the Shorters assumed the risk of the doctor's negligence. To expressly assume the risk of another's conduct, one must have knowledge of the risk, appreciate and understand its nature, and voluntarily choose to incur it. W. Keeton, *Torts* § 68, at 486–87 (5th ed. 1984); *Martin v. Kidwiler, supra* at 49. Express assumption of a risk requires assent to both the specific *type* and the *magnitude* of the risk. 57 Am. Jur. 2d *Negligence* § 281, at 674 (1971). Additionally, a person does not have the duty to foresee negligence when he voluntarily exposes himself to a known risk. *See Jones v. Wittenberg Univ.*, 534 F.2d 1203 (6th Cir. 1976).

Traditional tort analysis forecloses the result reached by the majority because the evidence in this case is insufficient to support a finding of assumption of risk by the Shorters. Dr. Drury's negligence greatly increased Mrs. Shorter's chances of bleeding to death; thus, the "magnitude" of the risk was increased. The record clearly reflects the fact that the Shorters believed the procedure was routine. The dangers of performing the D and C were never fully explained to the Shorters; they were not informed that three methods of accomplishing the procedure were available, nor were they told that the method Dr. Drury planned to use was the method most likely to result in uterine perforation and

excessive bleeding. The Shorters were merely informed of a generalized risk of bleeding inherent in the procedure. Awareness of a generalized risk is not sufficient to prove an express assumption of risk; there must be proof that a person knew and appreciated the *specific hazard* that caused the injury. *See Runnings v. Ford Motor Co.*, 461 F.2d 1145, 1148 (9th Cir. 1972); *Martin v. Kidwiler, supra; Klein v. R.D. Werner Co.*, 98 Wn.2d 316, 654 P.2d 94 (1982).

The majority concedes the Shorters did not expressly assume the risk of the doctor's negligence. Having decided that, it logically follows that the Shorters did not expressly assume the risk of bleeding to death as a result of refusing blood, where the need for such blood resulted from the doctor's negligence rather than from the risks inherent in the procedure itself.

Accordingly, we come full circle: the Shorters did not assume the risk of negligence; they similarly did not assume the risk that a refusal of blood, which was *necessitated by that negligence,* would cause death. Only through the most strained analysis can the majority find that the Shorters assumed *any* risk here, beyond those risks inherent in a nonnegligently performed procedure.

Thus, the jury could not have found that the Shorters assumed the risk of death under the facts here. I would hold it was error to submit the assumption of risk question to the jury. Accordingly, I would strike the finding that the Shorters assumed the risk of 75 percent of their injury and reinstate the full $412,000 verdict to Mr. Shorter. *See Klein v. R.D. Werner Co., supra* at 320.

UTTER, BRACHTENBACH, and DORE, JJ., concur with PEARSON, J.