[Nos. 53627–9, 54295–3. En Banc. July 7, 1988.]

JOHN E. WAGENBLAST, *as Guardian*, ET AL, *Respondents*, v. ODESSA SCHOOL DISTRICT No. 105–157–166J, ET AL, *Appellants*.

ARTHUR R. VULLIET, ET AL, *Appellants*, v. SEATTLE PUBLIC SCHOOL DISTRICT No. 1, ET AL, *Respondents*.

*Schroeter, Goldmark & Bender* and *William Rutzick,* for appellants Vulliet.

*Bassett & Morrison,* by *Mark S. Northcraft* and *Margaret A. Morgan,* for the school districts.

*Wagenblast & Strohmaier,* by *John F. Strohmaier,* for respondents Wagenblast, et al.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington Trial Lawyers Association, amici curiae.

ANDERSEN, J.—

## FACTS OF CASE

In these consolidated cases we consider an issue of first impression—the legality of public school districts requiring students and their parents to sign a release of all potential

future claims as a condition to student participation in certain school–related activities.

The plaintiffs in these cases are public school children and their parents.

Odessa School District students Alexander and Charles Wagenblast and Ethan and Katie Herdrick all desired to participate in some form of interscholastic athletics. As a condition to such participation, the Odessa School District requires its students and their parents or guardians to sign a standardized form which releases the school district from "liability resulting from any ordinary negligence that may arise in connection with the school district's interscholastic activities programs." The releases are required by a group of small Eastern Washington school districts, including Odessa, which "pooled" together to purchase liability insurance.

The Seattle School District also requires students and their parents to sign standardized release forms as a condition to participation in interscholastic sports and cheerleading. When Richard and Paul Vulliet turned out for the Ballard High School wrestling team, they and their parents were required to sign release forms which released the Seattle School District, its employees and agents "from any liability resulting from any negligence that may arise in connection with the School District's wrestling program."

The Wagenblasts and Herdricks brought suit in the Superior Court for Lincoln County to enjoin the Odessa School District's use of its release forms. The Vulliets brought their action in the Superior Court for King County, seeking both declaratory and injunctive relief.

The Superior Court for Lincoln County eventually granted the Wagenblast and Herdrick motions for summary judgment and permanently enjoined the Odessa School District from requiring the students and their parents to sign the releases. The court gave several grounds for its decision, chief among them that the release form is an unconscionable contract of adhesion and that the School

District's attempt to limit its liability is void as against public policy.

In King County, after a trial, the Superior Court rejected the Vulliets' challenge to the Seattle School District releases and denied their request for injunctive and declaratory relief.

When the Odessa School District appealed directly to this court, we retained the appeal. We transferred the Vulliets' separate appeal, which had originally been filed in the Court of Appeals, to this court and consolidated it with the Odessa appeal.[1]

One issue is determinative of these appeals.

## ISSUE

Can school districts require public school students and their parents to sign written releases which release the districts from the consequences of all future school district negligence, before the students will be allowed to engage in certain recognized school related activities, here interscholastic athletics?

## DECISION

CONCLUSION. We hold that the exculpatory releases from any future school district negligence are invalid because they violate public policy.

The courts have generally recognized that, subject to certain exceptions, parties may contract that one shall not be liable for his or her own negligence to another. As Prosser and Keeton explain:

> It is quite possible for the parties expressly to agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent. There is in the ordinary case no public policy which prevents the parties from contracting as they see fit, as to whether the plaintiff will undertake the responsibility of looking out for himself.

---

[1] See RAP 4.2(a) (types of cases reviewed directly); RAP 4.3 (transfer of cases by Supreme Court); RAP 3.3(b) (cases consolidated in appellate court).

(Footnotes omitted.) W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 68, at 482 (5th ed. 1984).[2]

In accordance with the foregoing general rule, appellate decisions in this state have upheld exculpatory agreements where the subject was a toboggan slide,[3] a scuba diving class,[4] mountain climbing instruction,[5] an automobile demolition derby,[6] and ski jumping.[7]

As Prosser and Keeton further observe, however, there are instances where public policy reasons for preserving an obligation of care owed by one person to another outweigh our traditional regard for the freedom to contract. Courts in this century are generally agreed on several such categories of cases.

Courts, for example, are usually reluctant to allow those charged with a public duty, which includes the obligation to use reasonable care, to rid themselves of that obligation by contract. Thus, where the defendant is a common carrier, an innkeeper, a professional bailee, a public utility, or the like, an agreement discharging the defendant's performance

---

[2]*Accord,* 4 F. Harper, F. James & O. Gray, *Torts* § 21.6 (2d ed. 1986); Restatement (Second) of Torts § 496B (1965); Restatement (Second) of Contracts § 195 (1981); *Griffiths v. Henry Broderick, Inc.,* 27 Wn.2d 901, 182 P.2d 18, 175 A.L.R. 1 (1947) (stating general rule); Annot., *Validity of Contractual Provision by One Other Than Carrier or Employer for Exemption From Liability, or Indemnification, for Consequences of Own Negligence,* 175 A.L.R. 8 (1948) (an exhaustive annotation of cases).

[3]*Broderson v. Rainier Nat'l Park Co.,* 187 Wash. 399, 60 P.2d 234 (1936), *overruled on other grounds in Baker v. Seattle,* 79 Wn.2d 198, 484 P.2d 405 (1971) (release language must be conspicuous).

[4]*Hewitt v. Miller,* 11 Wn. App. 72, 521 P.2d 244 (1974).

[5]*Blide v. Rainier Mountaineering, Inc.,* 30 Wn. App. 571, 636 P.2d 492 (1981).

[6]*Conradt v. Four Star Promotions, Inc.,* 45 Wn. App. 847, 728 P.2d 617 (1986) (upheld against claims that release language was inconspicuous and that promoter was grossly negligent).

[7]*Garretson v. United States,* 456 F.2d 1017 (9th Cir. 1972) (applying Washington law).

will not ordinarily be given effect.[8] Implicit in such decisions is the notion that the service performed is one of importance to the public, and that a certain standard of performance is therefore required.

Courts generally also hold that an employer cannot require an employee to sign a contract releasing the employer from liability for job–related injuries caused by the employer's negligence.[9] Such decisions are grounded on the recognition that the disparity of bargaining power between employer and employee forces the employee to accept such agreements.

Consistent with these general views, this court has held that a bank which rents out safety deposit boxes cannot, by contract, exempt itself from liability for its own negligence,[10] and that if the circumstances of a particular case suggest that a gas company has a duty to inspect the pipes and fittings belonging to the owner of the building, any contractual limitation on that duty would be against public policy.[11]

This court has also gone beyond these usually accepted categories to hold future releases invalid in other circumstances as well. It has struck down a lease provision exculpating a public housing authority from liability for injuries caused by the authority's negligence[12] and has also struck down a landlord's exculpatory clause relating to common

---

[8]Restatement (Second) of Torts § 496B, comment *g* (1965); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 68, at 482–83 (5th ed. 1984).

[9]Restatement (Second) of Torts § 496B, comment *f* (1965); W. Keeton, D. Dobbs, R. Keeton & D. Owen, at 482.

[10]*Sporsem v. First Nat'l Bank,* 133 Wash. 199, 233 P. 641, 40 A.L.R. 854 (1925).

[11]*Reeder v. Western Gas & Power Co.,* 42 Wn.2d 542, 256 P.2d 825 (1953).

[12]*Thomas v. Housing Auth.,* 71 Wn.2d 69, 426 P.2d 836 (1967).

areas in a multi–family dwelling complex.[13]

In reaching these decisions, this court has focused at times on disparity of bargaining power, at times on the importance of the service provided, and at other times on other factors. In reviewing these decisions, it is apparent that the court has not always been particularly clear on what rationale it used to decide what type of release was and was not violative of "public policy".[14] Undoubtedly, it has been much easier for courts to simply declare releases violative of public policy in a given situation than to state a principled basis for so holding.

 Probably the best exposition of the test to be applied in determining whether exculpatory agreements violate public policy is that stated by the California Supreme Court. In writing for a unanimous court, the late Justice Tobriner outlined the factors in *Tunkl v. Regents of Univ. of Cal.*, 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963):

> Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby

---

[13]*McCutcheon v. United Homes Corp.*, 79 Wn.2d 443, 486 P.2d 1093 (1971).

[14]*See* R. Brachtenbach, *Public Policy In Judicial Decisions*, 21 Gonz. L. Rev. 1 (1985–1986).

a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

(Footnotes omitted.) *Tunkl,* 60 Cal. 2d at 98–101.[15] We agree.

 Obviously, the more of the foregoing six characteristics that appear in a given exculpatory agreement case, the more likely the agreement is to be declared invalid on public policy grounds. In the consolidated cases before us, *all* of the characteristics are present in *each* case. We separately, then, examine each of these six characteristics as applied to the cases before us.

1. The agreement concerns an endeavor of a type generally thought suitable for public regulation.

Regulation of governmental entities usually means self–regulation. Thus, the Legislature has by statute granted to each school board the authority to control, supervise, and regulate the conduct of interscholastic athletics.[16] In some situations, a school board is permitted, in turn, to delegate this authority to the Washington Interscholastic Activities Association (WIAA) or to another voluntary nonprofit entity.[17] In the cases before us, both school boards look to the WIAA for regulation of interscholastic sports. The WIAA handbook contains an extensive constitution with rules for such athletic endeavors. These rules cover numerous topics, including student eligibility standards, athletic

---

[15]*Accord, Henrioulle v. Marin Ventures, Inc.,* 20 Cal. 3d 512, 518, 573 P.2d 465, 143 Cal. Rptr. 247 (1978); *Olson v. Molzen,* 558 S.W.2d 429, 431 (Tenn. 1977); *Anchorage v. Locker,* 723 P.2d 1261 (Alaska 1986); *Jones v. Dressel,* 623 P.2d 370 (Colo. 1981); *Krohnert v. Yacht Sys. Hawaii, Inc.,* 4 Hawaii App. 190, 664 P.2d 738 (1983); *Lynch v. Santa Fe Nat'l Bank,* 97 N.M. 554, 627 P.2d 1247 (Ct. App. 1981); *Schutkowski v. Carey,* 725 P.2d 1057 (Wyo. 1986). *See generally* 57 Am. Jur. 2d *Negligence* § 28 (1971).

[16]RCW 28A.58.125.

[17]RCW 28A.58.125.

awards, insurance, coaches, officials, tournaments and state championships. Special regulations for each sport cover such topics as turnout schedules, regular season game or meet limitations, and various areas of regulation peculiar to the sport, including the rule book governing the sport.

Clearly then, interscholastic sports in Washington are extensively regulated, and are a fit subject for such regulation.

2. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

This court has held that public school students have no fundamental right to participate in interscholastic athletics.[18] Nonetheless, the court also has observed that the justification advanced for interscholastic athletics is their educational and cultural value.[19] As the testimony of then Seattle School Superintendent Robert Nelson[20] and others amply demonstrate, interscholastic athletics is part and parcel of the overall educational scheme in Washington. The total expenditure of time, effort and money on these endeavors makes this clear. The importance of these programs to the public is substantive; they represent a significant tie of the public at large to our system of public education. Nor can the importance of these programs to certain students be denied; as Superintendent Nelson agreed, some students undoubtedly remain in school and maintain their academic standing only because they can participate in these programs. Given this emphasis on sports by the public and the school system, it would be

---

[18]*Darrin v. Gould,* 85 Wn.2d 859, 873, 540 P.2d 882 (1975).

[19]*Sherwood v. Moxee Sch. Dist. 90,* 58 Wn.2d 351, 360–61, 363 P.2d 138 (1961) (Hill, J., concurring), cited with approval in *Carabba v. Anacortes Sch. Dist. 103,* 72 Wn.2d 939, 955–57, 435 P.2d 936 (1967).

[20]Robert Nelson, who was superintendent at the time the Seattle School District case was tried, no longer occupies that position.

unrealistic to expect students to view athletics as an activity entirely separate and apart from the remainder of their schooling.[21]

This court observed in *McCutcheon v. United Homes Corp.,* 79 Wn.2d 443, 486 P.2d 1093 (1971), that it makes little sense to insist that a worker have a safe place to work but at the same time to deny that worker a safe place to live.[22] There is likewise little logic in insisting that one who entrusts personal property to a bank for safekeeping in a deposit box must be protected from the bank's negligence while denying such protection to a student who entrusts his or her person to the coaches, trainers, bus drivers and other agents of a school sports program.[23]

In sum, under any rational view of the subject, interscholastic sports in public schools are a matter of public importance in this jurisdiction.

3. Such party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

Implicit in the nature of interscholastic sports is the notion that such programs are open to all students who meet certain skill and eligibility standards. This conclusion finds direct support in the testimony of former Superintendent Nelson and the WIAA eligibility and nondiscrimination policies set forth in the WIAA handbook.

4. Because of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining

[21]This intimate relationship between interscholastic sports and other aspects of public education serves to distinguish this case from those involving private adult education for hazardous activities, *e.g.,* skydiving and mountain climbing.

[22]*McCutcheon,* at 450.

[23]*See also Tunkl v. Regents of Univ. of Cal.,* 60 Cal. 2d 92, 102, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963) ("We see no cogent current reason for according to the patron of the inn a greater protection than the patient of the hospital . . .").

strength against any member of the public who seeks the services.

Not only have interscholastic sports become of considerable importance to students and the general public alike, but in most instances there exists no alternative program of organized competition. For instance, former Superintendent Nelson knew of no alternative to the Seattle School District's wrestling program. While outside alternatives exist for some activities, they possess little of the inherent allure of interscholastic competition. Many students cannot afford private programs or the private schools where such releases might not be employed. In this regard, school districts have near–monopoly power. And, because such programs have become important to student participants, school districts possess a clear and disparate bargaining strength when they insist that students and their parents sign these releases.

5. In exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

Both school districts admit to an unwavering policy regarding these releases; no student athlete will be allowed to participate in any program without first signing the release form as written by the school district. In both of these cases, students and their parents unsuccessfully attempted to modify the forms by deleting the release language. In both cases, the school district rejected the attempted modifications. Student athletes and their parents or guardians have no alternative but to sign the standard release forms provided to them or have the student barred from the program.

6. The person or property of members of the public seeking such services must be placed under the control of the furnisher of the services, subject to the risk of carelessness on the part of the furnisher, its employees or agents.

A school district owes a duty to its students to employ ordinary care and to anticipate reasonably foreseeable dangers so as to take precautions for protecting the children in its custody from such dangers.[24] This duty extends to students engaged in interscholastic sports.[25] As a natural incident to the relationship of a student athlete and his or her coach, the student athlete is usually placed under the coach's considerable degree of control. The student is thus subject to the risk that the school district or its agent will breach this duty of care.

In sum, the attempted releases in the cases before us exhibit all six of the characteristics denominated in *Tunkl v. Regents of Univ. of Cal.,* 60 Cal. 2d 92, 98–101, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963). Because of this, and for the aforesaid reasons, we hold that the releases in these consolidated cases are invalid as against public policy.

Having decided the case on this basis, only two remaining aspects of the cases require discussion.

The first of these aspects is the relationship of this decision to the doctrine of assumption of risk. Another name for a release of the sort presented here is an express assumption of risk. If a plaintiff has released a defendant from liability for a future occurrence, the plaintiff may also be said to have assumed the risk of the occurrence. If the release is against public policy, however, it is also against public policy to say that the plaintiff has assumed that particular risk. This court has implicitly recognized that an express assumption of risk which relieves the defendant's duty to the plaintiff may violate public policy.[26] Accordingly, to the extent that the release portions of these forms

---

[24] *Carabba,* at 955.

[25] *Carabba,* at 956–57.

[26] *Shorter v. Drury,* 103 Wn.2d 645, 651–52, 695 P.2d 116, *cert. denied,* 474 U.S. 827 (1985). In *Shorter,* we concluded that a "Refusal to Permit Blood Transfusion" did not release a doctor from his own negligence and did not otherwise

represent a consent to relieve the school districts of their duty of care, they are invalid whether they are termed releases or express assumptions of risk.

Nonetheless, risks other than that of a school district's negligence may be present in any sporting event. For instance, an opponent may play recklessly, or the sport may be so inherently dangerous that no amount of reasonable supervision or training can eliminate all the vestiges of danger. If a student knowingly encounters one of these risks, but chooses to play on, it could be argued that the student has voluntarily encountered the risk. By our opinion today we do not rule on this question; the law of assumption of risk has developed and will continue to develop on a case–by–case basis and there are no facts before us on the basis of which we can appropriately make any decision on this.

Nor do we decide whether the listing of various risks on these forms can or will in a given case establish that the student has assumed any of the listed risks. To elaborate, in addition to the release language discussed above, the forms supplied by both school districts recite numerous risks associated with participation in interscholastic sports. The Superior Court for King County said nothing about these recitations, but the Superior Court for Lincoln County concluded that "[a] generalized assumption of risk such as this is not effective since any such risk should be considered on a case–by–case basis . . ." This language could, perhaps, be interpreted as holding that the knowledge imparted by these recitations can never be considered in determining whether a student assumed a particular risk. We choose, however, to interpret the trial court's statement as suggesting only that the effect of such recitations can

violate public policy. Cited with approval in *Shorter* was Restatement (Second) of Torts § 496B (1965), which recognizes that an express agreement to assume a risk may be invalid as against public policy.

only be determined on a case–by–case basis.[27] This is consistent with this court's decisions which say that in order to prove an express assumption of risk, the evidence must show that the plaintiff (1) had full subjective understanding, (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter that risk.[28] By their very nature, the existence of these characteristics can only be determined with reference to the facts of an actual lawsuit.

The remaining aspect of these appeals which merits discussion is the Legislature's role in deciding such matters of public policy. By act of the territorial Legislature of 1869, school districts were made liable for their acts of negligence.[29] At the 1917 session of the State Legislature, a bill to absolutely immunize school districts from negligence passed the Senate, but the bill which was ultimately enacted that year was a compromise; that compromise barred actions against school districts for noncontractual acts or omissions relating to any park, playground, field house, athletic apparatus or appliance or manual training equipment.[30] This compromise statute, in turn, was repealed some years later—by the 1967 Legislature.[31] Thus, since territorial days, the State Legislature has generally followed a policy of holding school districts accountable for

---

[27]This interpretation also leads to the conclusion that the Lincoln County Superior Court's injunction is not related to this portion of the forms.

[28]*Kirk v. WSU*, 109 Wn.2d 448, 453, 746 P.2d 285 (1987).

[29]Laws of 1869, p. 154, § 602, ch. 54 (now codified as RCW 4.08.120); *see also* RCW 4.96.010; *Redfield v. School Dist. 3*, 48 Wash. 85, 92 P. 770 (1907) (first case in which a school district held liable for agent's negligence).

[30]Laws of 1917, ch. 92, p. 332 (former RCW 28.58.030). For a history of these enactments, *see Sherwood v. Moxee Sch. Dist. 90*, 58 Wn.2d 351, 354–56, 363 P.2d 138 (1961); *Stovall v. Toppenish Sch. Dist. 49*, 110 Wash. 97, 99–102, 188 P. 12, 9 A.L.R. 908 (1920); *Snowden v. Kittitas Cy. Sch. Dist. 401*, 38 Wn.2d 691, 699–717, 231 P. 621 (1951) (Finley, J., dissenting).

[31]Laws of 1967, ch. 164, § 16, p. 804.

their negligence. Our decision today is in general accordance with that policy.[32]

Legislative policies may, of course, change with changing conditions. This opinion is not to be construed as precluding school districts from attempting to convince the Legislature that their problems in this area require a legislative response of one kind or another. The Legislature through its hearing processes is well suited to making such inquiries and has tools and resources adequate to the task.[33]

The decision of the trial court in the Odessa School District case is affirmed and the decision of the trial court in the Seattle School District case is reversed.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, CALLOW, GOODLOE, and DURHAM, JJ., concur.

---

[32]Early on, Washington was in the distinct minority in this regard. *See Sherwood,* at 357.

[33]*Burkhart v. Harrod,* 110 Wn.2d 381, 755 P.2d 759 (1988).