OPINION OF THE COURT
Edward H. Lehner, J.
Last Friday in discussing this case I indicated that the issues before me dealing with the deceased’s refusal to accept blood transfusions raised some of the most difficult legal issues I have been faced with during my years on the Bench. Over the weekend I have read every case I could find on the subject. *44 Interestingly, in one of the most recent cases I came across, Judge Senter, the Chief Judge for the United States District Court for the Northern District of Mississippi, commenced his opinion in Munn v Southern Health Plan (719 F Supp 525, 526, mod on other grounds sub nom. Munn v Algee, 730 F Supp 21, affd 924 F2d 568) by stating "This wrongful death case presents some of the most difficult questions which this court has ever been asked to resolve.”
In analyzing the few cases in the area, I find that they can essentially be classified into three groups. The first is those in which a petitioner is seeking government guaranteed benefits, such as disability or unemployment insurance, which have been denied because the petitioner declined medical treatment for religious reasons. Two cases, Martin v Industrial Acc. Commn. (147 Cal App 2d 137, 304 P2d 828), decided in 1956, and Industrial Commn. v Vigil (150 Colo 356, 373 P2d 308), decided in 1962, both denied benefits because the decision to refuse medical treatment based on religious grounds was held to be unreasonable, it being ruled that an injured party’s religious beliefs should not subject his employer to greater liability than if the religious beliefs did not cause the employee to refuse treatment.
However, after the 1963 Supreme Court decision in Sherbert v Verner (374 US 398), one case in this area reached a contrary position. In Sherbert the Supreme Court ruled that unemployment insurance benefits could not be denied a Seventh Day Adventist because she refused employment in jobs that required her to work on Saturdays.
In the 1973 case of Montgomery v Board of Retirement (33 Cal App 3d 447, 109 Cal Rptr 181) the court held based on Sherbert (supra), that the Martin case (supra), referred to above, was no longer good law, and disability benefits were granted to a person whose refusal to undergo surgery on religious grounds prevented her from being able to return to work.
However, in the 1969 case of Nashert & Sons v McCann (460 P2d 941), the Oklahoma Supreme Court, without referring to Sherbert (supra), held that an injured worker could not obtain benefits for a disability attributable to failure to accept medical treatment due to religious beliefs.
A second related area is that involving cases where it is urged that a tortfeasor should not be held liable for damages that could have been mitigated through some surgical procedure. The general rule in this area, of course, is that an injured party has an obligation to mitigate his injury in such manner *45 as would a reasonably prudent person. This principle is encompassed in New York Pattern Jury Instruction 2:325.
The issue in the few cases where medical treatment was declined on religious grounds has been whether the jury should be instructed to apply an objective "reasonably prudent person” standard or whether the jury in determining the reasonableness of the injured party’s refusal should consider the party’s religious beliefs.
In Christiansen v Hollings (44 Cal App 2d 332, 346, 112 P2d 723, 730), a 1941 case, the court concluded that: "If the injuries are such that a reasonably prudent man would seek medical care, such care must be secured. But where the injuries are not of such a nature * * * the jury may properly consider the religious beliefs of the injured person in ascertaining whether he exercised reasonable care. Certainly, the courts should not disregard the beliefs held by a large number of reasonable and intelligent people in passing on the efficacy of the curative means adopted by the injured person.”
In Munn v Southern Health Plan (supra, at 528), Chief Judge Senter in his 1989 decision referred to the so-called "eggshell * * * skull rule”, to wit, a tortfeasor is responsible for injuries proximately resulting from the tort, which damages will vary depending on the condition of the injured party. The Judge, however, concluded that this rule "speaks only of physical conditions which pre-exist the injury for which compensation is sought and lead to unforeseeably severe results”, but that "[t]he religious beliefs of the plaintiff simply are not covered by this rule” (at 529). He further said that adopting a rule that "required one citizen to pay damages for the consequences of another’s exercising her religious freedom would favor an establishment of religion in a way which seems constitutionally unsupportable” (at 529-530). The court ruled, in deciding a motion for summary judgment, that an objective standard should be applied and that the defendant tortfeasor had no liability for the decedent’s death if "the refusal of the transfusion was unreasonable” (at 532).
The most recent case on this subject is that of Williams v Bright (167 Misc 2d 312), where my learned colleague, Justice Greenfield, issued an exhaustive opinion. There, in dénying a motion to set aside the verdict on liability, Justice Greenfield upheld the charge he gave, the crucial portion of which was that in assessing damages the jury should consider whether the plaintiff " 'acted reasonably as a Jehovah’s Witness in refusing surgery which would involve blood transfusions’ ” *46 (supra, at 317). The charge further directed the jury to consider: " 'Was it reasonable for her, not what you would do — or your friends or family — was it reasonable for her, given her beliefs, without questioning the validity or the propriety of her beliefs’ ” (supra). The appeal from this decision was apparently argued in May of last year before the Appellate Division, but is still undecided.
Although the defendant herein is requesting a charge on mitigation of damages, I am declining such request as I do not believe it appropriate in this medical malpractice case. As I will shortly indicate, I think the issue posed by the refusal to accept a blood transfusion is more properly considered in the context of an assumption of risk.
If this were a mitigation of damages issue, I would think that neither approach referred to above is proper, but rather the jury should only be asked whether the refusal was based on a sincerely held religious belief. If instead the question posed is whether a reasonably prudent person would decline the blood transfusion, we would then be asking the jury to determine the reasonableness of Mr. and Mrs. Rosewicz’s religious beliefs, which I do not believe is constitutionally permissible. On the other hand, to ask whether a reasonably prudent Jehovah’s Witness would decline the transfusion would require knowledge not possessed as we have had no testimony on the issue other than that Mrs. Rosewicz became a Jehovah’s Witness in 1988 (three years before her death), and apparently, as a matter of religious belief, considered that it was improper to accept a blood transfusion. We do not know whether that is a unanimous or even a majority opinion among members of the Jehovah’s Witness sect, or whether that church operates under a hierarchy system such as the Catholic Church. While we know that the Catholic Church, as a matter of religious teaching, opposes abortion, we have heard of polls that show that many Catholics will undergo that procedure. If a claim before the court was that having an abortion would mitigate damages, could the court ask a jury to decide whether it was reasonable to refuse that procedure on religious grounds. I think not. Parenthetically, in Troppi v Scarf (31 Mich App 240, 260, 187 NW2d 511, 520 [1971]), where a pharmacist filled a prescription for birth control pills with a tranquilizer and was sued in negligence for producing an "unwanted” life, the court ruled, as a matter of law, that the jury in considering damages may not "take into consideration the fact that the plaintiffs might have aborted the child”.
*47 Thus, if the issue here related to a mitigation of damages, I believe that the most proper rule would be to ask the jury whether the refusal to have a blood transfusion was based on "a sincerely held religious belief’ and, if so, they are not to reduce damages by reason of an injured party’s refusal to accept a transfusion. In such a way the jury would not be considering the reasonableness of the party’s beliefs, either objectively or as a member of a particular religious order.
This approach was followed by the Third Circuit in Lewis v Califano (616 F2d 73), a 1980 disability benefits case, where the claimant, a member of the Church of God, refused to undergo surgery due to her religious belief in faith healing. However, the proof showed, from testimony of a minister, that the Church had no tenet against resorting to surgery. An Administrative Law Judge determined that the claimant’s condition was "remediable” and denied the claim. On appeal, the matter was remanded for a determination on the sincerity of the claimant’s religious beliefs, the court stating: "The import of the Secretary’s argument is that an individual’s belief which is not a tenet of the church in which she worships is not a belief protected by the First Amendment and thus denial of benefits to claimant would not violate the establishment clause. This presents the question of whether an individual’s belief, not adopted by, but consistent with the views of, his sect, is a religious belief protected by the First Amendment. The First Amendment was designed in large part to protect freedom of conscience * * * To fulfill this goal adequately, the Amendment may be read to accommodate the conscience of each individual * * * Like the rest of the First Amendment, the free exercise clause should be sensitive to the conscience of individuals. In this case there was evidence from which the ALJ could have made a finding that claimant was sincerely following her religious belief in refusing surgery” (at 79).
As I said at the close of testimony on Friday, I had always assumed that the sole basis for the refusal to undergo a blood transfusion was the decedent’s religious beliefs. However, on Friday, after plaintiff had rested and during cross-examination of defendant’s expert, plaintiff’s counsel inquired as to the medical risks of a blood transfusion. Since there was no testimony that the decedent or her husband had declined transfusions based on medical risks, I find that such issue is not in the case and plaintiff may not make such argument before the jury. In any event, to decline a transfusion on medi *48 cal grounds under the circumstances presented herein would clearly be unreasonable.
I now come to the third class of cases dealing with this issue: those involving claims of malpractice against a physician on behalf of a decedent who had refused transfusions on religious grounds.
I am aware of only two such cases, the first being Shorter v Drury (103 Wash 2d 645, 695 P2d 116, cert denied 474 US 827). In that case Mrs. Shorter had a "missed abortion”, which is where the fetus dies but the uterus fails to discharge it. To cleanse the uterus, the defendant recommended a dilation and curettage, a procedure that does involve a risk of bleeding, to which Mr. and Mrs. Shorter consented. They also signed a release indicating that as members of the Jehovah’s Witness Church, no blood or blood derivative was to be administered to Mrs. Shorter and that neither the hospital nor the physicians involved would be responsible for " 'any untoward results due to my refusal to permit the use of blood or its derivatives and I fully understand the possible consequences of such refusal on my part’ ” (103 Wash 2d, at 649, 695 P2d, at 119). When the surgeon’s currette lacerated Mrs. Shorter’s uterus, she commenced bleeding profusely and although she was thereafter warned that she would likely die due to blood loss if she did not have a transfusion, she declined and bled to death.
After a trial, the jury found the surgeon’s negligence was a proximate cause of Mrs. Shorter’s death and damages of $412,000 were assessed. But because the jury also found that Mr. and/or Mrs. Shorter knowingly and voluntarily assumed the risk of death, it attributed 75% of the fault for the death upon the refusal to accept a blood transfusion, and the award was consequently reduced by 75% to $103,000. The finding of negligence against the physician was not appealed, but he did claim that the release should bar any recovery against him.
By a 5-4 vote, the Supreme Court of Washington, sitting en banc, upheld the jury apportionment, holding that by signing the aforesaid document, the Shorters "did not voluntarily assume the risk of negligence by defendant, but did voluntarily assume the risks relating to the refusal of transfusions of blood or blood products” (Shorter v Drury, supra, 103 Wash 2d, at 654, 695 P2d, at 121). It is noted that doctors for both sides agreed that a transfusion would probably have saved the decedent’s life.
The minority in the Shorter case would have reinstated the full verdict on the argument that the "Shorters did not *49 expressly assume the risk of bleeding to death as a result of refusing blood, where the need for such blood resulted from the doctor’s negligence rather than from the risks inherent in the procedure itself’ (Shorter v Drury, supra, 103 Wash 2d, at 662, 695 P2d, at 125).
The majority also concluded that the First Amendment was not implicated since there was no "state action or interference * * * [but merely] a dispute between private individuals” (Shorter v Drury, supra, 103 Wash 2d, at 659, 695 P2d, at 124). While the United States Supreme Court denied certiorari in this case, that, of course, does not indicate agreement with the conclusion reached.
The most recent malpractice case located was Corlett v Caserta (204 Ill App 3d 403, 562 NE2d 257). There the decedent, a Jehovah’s Witness, also had signed a form indicating that he would not accept a blood transfusion. Plaintiffs expert testified that had the aspirin provided the decedent been discontinued two days earlier and a different drug given, the bleeding would have stopped and he would not have needed a transfusion. However, the expert conceded that had a consent to transfuse been given when requested after the bleeding had commenced, the patient’s death could have been averted.
The trial court grant of summary judgment to the doctor based on the release form was reversed on appeal, the court holding that the wrongful death claim states a cause of action as it is based on the doctor’s "alleged negligent failure to timely diagnose and treat [the patient’s] gastric bleeding following colon surgery”, and that the form signed did not release the surgeon from liability for failing to properly diagnose and treat his condition (Corlett v Caserta, supra, 204 Ill App 3d, at 410, 562 NE2d, at 261). The court, coming to a result similar to that in the Shorter case (supra), stated that: "there is a marked distinction between a patient’s exercise of his fundamental and religious rights to refuse a life-saving medical treatment and a patient’s attempt to impose the consequences of his religious decisions upon a physician who has committed a tort against him. The freedom to act upon one’s religious convictions does not encompass the privilege of imposing tort liability on another for injuries resulting, not from another’s tortious conduct, but rather from the voluntary practice of one’s religious convictions” (204 Ill App 3d, at 412-413, 562 NE2d, at 262).
The court concluded that: "when a physician’s negligent act causes a patient to suffer life-threatening injuries, and the *50 patient exercises his fundamental and religious right to refuse a reasonable life-saving medical procedure and subsequently dies, the patient’s estate must bear a proportionate share of tort liability for the patient’s wrongful death, to the extent that the patient’s death was proximately caused by the patient’s refusal of the reasonable life-saving treatment” (Corlett v Caserta, supra, 204 Ill App 3d, at 413, 562 NE2d, at 263). In determining such apportionment, the court stated that it should be made "based upon principles of comparative fault, assumption of the risk, or mitigation of damages”, without determining which concept would be applicable (204 Ill App 3d, at 416, 562 NE2d, at 264).
In charging the jury and submitting a verdict sheet, I intend to follow the principles of the last two cited malpractice cases.
The first inquiries to the jury will be whether the defendant was negligent by reason of the various claimed departures asserted by plaintiff. With respect to each departure, the jury will be asked whether the negligence was (i) a substantial contributing factor of any conscious pain and suffering sustained by Mrs. Rosewicz and (ii) whether it was a substantial contributing factor of her death. Of course, if the jury does not find defendant negligent under any of the claimed departures, the jury will proceed no further. Likewise, unless the jury finds at least one departure was a substantial contributing factor of injury or death, then again the jury will proceed no further.
The next questions to be posed in the verdict sheet will be whether Mr. and/or Mrs. Rosewicz expressly assumed the risk of any conscious pain and suffering by refusing to submit to blood transfusions, and the same question with respect to the claim of wrongful death.
While I have a question as to how defendant’s negligence can be a proximate cause of death when the preponderance of the evidence demonstrates that a transfusion of blood would have prevented the death, I will allow the jury to apportion fault on the claim of wrongful death as was done in the two malpractice cases referred to above and will reserve decision as to whether apportionment is appropriate.
I will charge the standard PJI malpractice charge in full, pointing out, of course, that the defendant, as the employer of the various medical personnel treating Mrs. Rosewicz, is responsible for any negligence of its employees. I will then charge the standard proximate cause charge and then add with respect to assumption of risk: "The law provides that when a party fully understands a risk of harm from following *51 a certain course of activity, a plaintiff’s damages must be reduced by the extent to which these damages were caused by the plaintiffs own conduct. If you find that Mr. and/or Mrs. Rosewicz knew and fully understood the risks to Mrs. Rosewicz in declining blood transfusions, then you will find that they assumed a risk of injury and/or death to Mrs. Rosewicz and you must consider the degree to which the assumption of risk contributed to the injury and/or death. Bear in mind that you only consider this issue with respect to the claim for conscious pain and suffering sustained prior to death if you should find that the defendant was negligent and the negligence was a substantial contributing factor in causing such conscious pain and suffering. Similarly, with respect to the claim for wrongful death, you only reach this issue if you find that defendant was negligent and that the negligence was a substantial contributing factor in causing the death of Mrs. Rosewicz.”
[Portions of opinion omitted for purposes of publication.]