OPINION OF THE COURT
Edward J. Greenfield, J.
This personal injury case has given rise to a sharp clash of views as to basic constitutional rights. If a court permits a jury in determining the verdict in a case to consider whether or not a person’s religious beliefs are or are not reasonable, does that constitute a restraint on the cherished right of the free exercise of religion, or conversely, does the refusal of a court to allow it give the party professing unique religious beliefs a special preference not available to others? The First Amendment of the United States Constitution prohibits the Federal Government, and by the extension of the Fourteenth Amendment, the States, from any official action which would either restrict the free exercise of religion or do anything to establish or promote it. New York Constitution, article I, § 3 is even more explicit. It proclaims that the free exercise and enjoyment of the religious profession and worship shall forever be allowed in this State to all mankind "without discrimination or preference.”
The context in which the issue is raised in this case is the extent of the duty to mitigate damages when a proposed course of treatment would violate a plaintiffs deeply held religious beliefs. The law is clear that with respect to damages, a plaintiff has a duty to mitigate so as not to unduly penalize a defendant. Normally, that obligation is to do what a reasonable person would have done to alleviate or cure the condition. *314 Ordinarily that involves a weighing of the costs, benefits and medical risks involved. However, when a person declines a particular course of medical treatment, not because of the risk or the cost, but because it violates his or her deeply held religious scruples, can damages be denied because alleviation or cure has been declined? Plaintiff contends that to permit a jury to pass upon the soundness of religious beliefs would constitute discrimination, imposing a possible penalty on the free exercise of religion. Defendant, on the other hand, contends that it should not be penalized by having to pay higher damages, since then the court would be giving a preference to a party who is excused from a duty to mitigate as a result of her religion.
There is no law directly on this point in the State of New York, and relatively little in other jurisdictions. "The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions.” (Church of the Lukumi Babalu Aye v City of Hialeah, 508 US 520, 523 [1993].)
New York’s Pattern Jury Instructions (PJI 2:325, at 692), dealing with mitigation of damages, sets forth as the standard that: "A person who has been injured is not permitted to recover for damages that he could have avoided by using means which a reasonably prudent person would have used * * * Defendant contends that if plaintiff submitted to an operation his (injury, pain) would be (completely cured, greatly alleviated) and that such an operation is not dangerous * * * [Y]ou must decide whether in refusing to have an operation plaintiff acted as a reasonably prudent person would under the circumstances -* * * If you find that, in making the determination not to have an operation, plaintiff acted as a reasonably prudent person would to cure himself, then he is entitled to recover for his injuries, as you find them to be, without regard to the possibility of a surgical operation. If, however, you find that the operation is one that a reasonably prudent person would submit to and that the operation would (cure the injury, relieve the pain), you will take that fact into consideration in arriving at the amount of damages, if any, that you award.” However, the PJI recognizes that a religious objection to possible mitigation may arise, stating: "No New York case dealing with an infant plaintiff or a plaintiff whose religious beliefs limit medical care has been found.” (1 NY PJI 694.)
In this case, the issue is squarely posed. After a trial, where the testimony was that without surgical intervention the injuries would be severely disabling, the court charged the jury *315 with respect to this issue of mitigation. After a substantial jury verdict, defendants, who took strenuous objection to the charge as given, moved to set aside the jury verdict and direct a new trial. The posttrial motion raises some other issues as well.
THE FACTS
Plaintiff, Gwendolyn Robbins, a 55-year-old woman, was a passenger in a rented automobile driven by her father and owned by defendant Meritor when the car went off the road in upstate New York, plunged down an embankment and overturned. Her mother and father, seated in front, were killed in the accident. Plaintiff Charles Williams, married to her niece, who had been sitting alongside Robbins, sustained multiple injuries including a fractured spine, and was rendered a paraplegic. (His case was settled before the end of the trial, but the trial continued as to plaintiff Robbins.) Robbins, who was also severely injured, was taken to the Glens Falls Hospital, where last rites were administered. Robbins sustained chest, abdominal and hip injuries. She had a comminuted fracture of the acetabulum, a compound comminuted fracture of the right femur, a fractured ankle and a fracture of the left hip. The normal treatment would have required, among other things, open reduction and fixation of the displaced bones and ligaments. This would have necessitated blood transfusions. The hospital record noted, however, that she:
"is a Jehovah’s Witness. This patient strongly refuses to have any transfusion of blood or blood products.
"She is quite aware of the risks and complications from progressive anemia [from which she was then suffering] including the possibility of dying from it. In spite of this, she strongly refuses transfusions as stated above.”
She chose to forego any surgical intervention, and after two weeks she was transferred to the Hospital for Joint Diseases in New York City. There Steinman pins were put through both legs and she was kept suspended in traction for six weeks. While she agreed to such painful and protracted treatment, she adamantly refused any treatment which would have necessitated a blood transfusion. She was sent to the Orthopedic Institute for Rehabilitation, and finally returned home in a wheelchair. It took a year before she could get out of the wheelchair and she then used a walker and crutches for another six months. She was unable to go out for a period of two years. She is presently able to ambulate with difficulty, primarily to attend church services.
*316 Dr. Lester Lieberman, an orthopedic surgeon, confirmed her injuries, found that the sacroiliac joint had widened, that there was sciatic nerve injury and that traumatic arthritis was developing. There was shortening of the leg and osteoarthritic formations. He further found that there was grade 3 aseptic necrosis of the hip — in other words that the bone was degenerating and would not be capable of weight bearing. It was his opinion that she needed total surgical replacement of the right knee and left hip, inserting an artificial acetabulum and replacing the head of the femur with a steel ball. In addition, procedures were required to reset a bone spike protruding into the muscle and nerves around plaintiff’s right knee. Without this, he testified, plaintiff would within three to four years become wheelchair bound or bedridden for the balance of her life and would require substantially increased medical and hospital services and home care. Such surgical interventions would necessitate blood transfusions, and consequently Mrs. Robbins, as a devout Jehovah’s Witness, has refused to allow these procedures to be done, no matter what amelioration of her condition would result. According to the tenets of her faith, while acceptance of blood transfusions might ease the balance of her life on earth, it was forbidden by her religion, and if accepted would deprive her of entry into the Kingdom of Heaven for all eternity.
THE CHARGE
On the issue of mitigation of damages, the court was requested by the defendants to charge that the jury should consider Mrs. Robbins’ religious beliefs on the issue of whether or not her conduct in refusing remedial surgery was reasonable or not reasonable. The court ruled that asking the jury to consider in the abstract whether "a reasonably prudent person” would submit to the suggested surgery would require them to pass on whether plaintiff’s religious beliefs as a Jehovah’s Witness were reasonable, and hence could not be permitted, since no secular jury could be called upon to pass on the reasonableness of anyone else’s religious faith and beliefs.
The court therefore charged the jury on this issue as follows:
"The law provides, with respect to damages, that a person who has been injured is not permitted to recover for damages that she could have avoided by using means which a reasonably prudent person would have used to cure the injury or alleviate the situation.
*317 "And it is one of the functions of the jury ordinarily to determine whether a plaintiff acted reasonably in refusing a particular suggested procedure
"Usually that’s because you are weighing the medical risks involved, but in this case you have a different consideration which prevails.
"The reason that Mrs. Robbins rejected the surgery in the past and the recommended surgery in the future, is not because of the physical risk, but because of her strongly held religious beliefs that there can be no blood transfusion.
"Now, in making your determination as to whether she has acted reasonably to mitigate the damage, I will instruct you that under no circumstances are you to consider the validity or reasonableness of her religious beliefs * * * [W]e cannot have a situation in which jurors, in passing on the reasonableness of somebody’s conduct, pass upon whether their religious beliefs are reasonable or not reasonable.
"What is reasonable for adherent of one religion may appear totally unreasonable to someone who has different beliefs, but you may not pass upon the validity of anyone else’s beliefs. That is out of bounds for you.
"You have to accept as a given that the dictates of her religion forbid blood transfusions.
"And so you have to determine in assessing the question of damages, damages past and damages future, whether she, Mrs. Robbins, acted reasonably as a Jehovah’s Witness in refusing surgery which would involve blood transfusions.
"Was it reasonable for her, not what you would do — or your friends or family — was it reasonable for her, given her beliefs, without questioning the validity or the propriety of her beliefs.”
The jury having found liability, they awarded damages of $163,244.81 for past medical and hospital bills, $1,500,000 for past pain, suffering and disability, $3,982,900 for future hospital, medical and nursing and home care expenses, and $4,000,000 for future pain, suffering, disability and loss of enjoyment of life.
DUTY TO MITIGATE — IS THERE A RELIGIOUS EXCEPTION?
Defendants contend that the duty to mitigate damages is basic in our law. Over a century ago, the Court of Appeals in Hamilton v McPherson (28 NY 72, 76), speaking of the plaintiff’s duty to mitigate, declared: "The law for wise reasons, *318 imposes upon a party subjected to injury * * * the active duty of making reasonable exertions to render the injury as light as possible. Public interest and sound morality accord with the law in demanding this; and if the injured party, through negligence or willfulness, allows the damages to be unnecessarily enhanced, the increased loss justly falls upon him.” (See also, Den Norske Ameriekalinje Actiesselskabet v Sun Print. & Publ. Assn., 226 NY 1, 7.)
Here, the refusal of the plaintiff to agree to remedial surgery to avert total disability arises neither out of negligence nor willfulness, but rather from a sincerely held religious belief that blood transfusions are never to be permitted. She is not weighing physical risks or financial costs, but is motivated by her religious belief that it may be better to suffer present pain than to be barred from entering the Kingdom of Heaven. As previously noted, the New York Pattern Jury Instructions, in setting forth a charge on mitigation of damages, observed that there was no New York case dealing with mitigation in the face of religious beliefs.
Defendant argues that if plaintiff had not objected to surgical procedures which would involve blood transfusions, her initial recovery period would have been lessened, and with hip and knee replacement surgery in the future, her prognosis would be for recovery rather than future confinement to wheelchair, bed and home. Indeed, the bulk of the damages awarded for future hospital expenses and medical expenses, and for future pain, suffering and disability, are premised upon the medical prediction, which the jury was entitled to accept, that without such intervention, she would encounter essentially total disability within a few years and would remain so disabled for the remaining 24 years of her life expectancy.
Permitting a jury to determine whether one acting on the basis of deeply held religious beliefs is acting "reasonably” would allow it, acting as an instrumentality of the State judicial system, possibly to discriminate against those whose religious beliefs were deemed unreasonable. On the other hand, permitting a jury to sidestep an injured plaintiff’s duty to mitigate because of her religious beliefs might "establish” her religion and give it priority over generally applicable secular rules, causing a defendant to pay higher damages. Pragmatic experience and constitutional principles warn us that either choice may put us on precarious ground. We can neither enshrine nor denigrate religious beliefs in our secular institutions, but must attempt to proceed on neutral principles. In *319 our courts, "[t]heology is to be protected against the law, just as the law is to be protected from theology.” (Pando v Fernandez, 127 Misc 2d 224, 231, revd on other grounds 118 AD2d 474.) The commandments of scrupulous neutrality are easy to pronounce but difficult to apply.
There being no New York cases directly in point on the conflict between the general duty to mitigate and the conscientious objection to doing so on religious grounds, we are required to extrapolate from other cases dealing with the clash between religious and secular requirements.
The United States Supreme Court has set out some guideposts which mark the boundaries between the permissible and the impermissible, and leave for further determination such questions as are here involved dealing with the scope of mitigation. We can start the analysis with Sherbert v Verner (374 US 398 [1963]). In that case, the appellant, a member of the Seventh Day Adventist Church, was denied unemployment compensation benefits by the State of South Carolina when she refused to accept employment which required that she work on Saturday, the Sabbath of her faith. The State argued that all citizens equally should be required to accept suitable work when offered, regardless of religion. The Court, per Justice Brennan, held: "to condition the availability of benefits upon th[e] appellant’s willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.” (Supra, at 406.) Answering the argument that making an exception for her in effect was the establishment of her religion, the Court declared that its holding overturning the State’s action "reflect[ed] nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall.” (Supra, at 409.) Only a compelling government interest would justify the infringement of First Amendment rights. (Accord, Thomas v Review Bd., Ind. Empl. Sec. Div., 450 US 707 [1981]; Hobbie v Unemployment Appeals Commn. of Fla., 480 US 136 [1987].)
Subsequently, in Wisconsin v Yoder (406 US 205 [1972]), the Court made it clear that a religious practice or belief could be accommodated without violating the Establishment Clause. (Supra, at 221.) There the State of Wisconsin sought to enforce its compulsory educational law by requiring school attendance beyond the eighth grade of Amish children, such attendance being contrary to Amish religious belief. The Court, again ap *320 plying the compelling State interest theory as set forth in Sherbert (supra), in balancing the interest of the State when "it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment” (supra, at 214), found no compelling State interest in compulsory education laws which would outweigh an exemption for the Amish beliefs. In so finding, the Court in Yoder again reiterated: "a regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion.” (Supra, at 220.)
However, in Employment Div., Ore. Dept. of Human Resources v Smith (494 US 872 [1990]), where employees of a drug rehabilitation organization had been fired for misconduct for use of the hallucinogen peyote in connection with the sacraments of their Native American Church, and denied unemployment compensation benefits, the Supreme Court held that the Free Exercise Clause did not prohibit the application of Oregon drug laws which might inhibit religious rites. Such criminal laws, the majority held, being of neutral and general application, need not carve out exceptions for otherwise illegal conduct or socially harmful acts performed under the umbrella of religious belief. It distinguished this from religious conduct not prohibited by law. (Supra, at 876.) The Court went on to purport to restrict the doctrine of Sherbert v Verner (supra, 374 US, at 402-403) that any governmental action which substantially places a burden on religious practice must be justified by a "compelling governmental interest” only to cases involving the denial of unemployment compensation. (494 US, at 883, supra.) Nevertheless, the Court declared: "Repeatedly, and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.” (Supra, at 887.)
Justice O’Connor, concurring with three other Justices, rejected repudiation of the compelling interest test. She cited as a continuing principle the doctrine enunciated in Thomas v Review Bd., Ind. Empl. Sec. Div. (450 US 707, 717, 718, supra): " 'Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.’ 450 U.S., at 717-718.” (Supra, at 897.)
*321 While the defendants herein rely heavily on the opinion by Justice Scalia in Smith (supra) as supporting their position that the requirement that all persons must take reasonable steps to mitigate damages is a rule generally applicable and on its face, if not in application, religiously neutral. They argue that the cost of accommodating plaintiffs religious principles must therefore be borne by herself.
This ignores the fact that unlike a criminal statute which clearly labels certain conduct unlawful, here the judicial arm of the State is being called on to exercise judgment in order to determine if religiously motivated conduct is "reasonable”. If the Jehovah’s Witness rejection of blood transfusion in surgery is deemed by a jury to be "unreasonable”, then a judgment has been made as to the soundness of the religion. "A jury verdict thus penalizing religiously motivated conduct may reflect a conclusion either that such conduct deviates from community norms, or that the underlying religious beliefs are simply false.” (Note, Medical Care, Freedom of Religion, and Mitigation of Damages, 87 Yale LJ 1466, 1484 [1978].) The making of such a determination is clearly beyond the scope of what any agency of government may do. In United States v Ballard (322 US 78 [1944]) a prosecution for mail fraud in which defendants were charged with soliciting funds by allegedly misrepresenting that they were divine messengers and the alter egos of Jesus and George Washington with the supernatural power to heal, the trial court charged the jury that it could not pass upon the plausibility of what defendants professed. In language paralleling the charge in this case, the Court said that "the religious beliefs of these defendants cannot be an issue in this court.” (Supra, at 81.) It charged: "The question of the defendants’ good faith is the cardinal question in this case. You are not to be concerned with the religious belief of the defendants, or any of them.” (Supra, at 82.) The jury evidently concluded the professions of religious belief were mere pretenses, and found the defendants guilty. Justice Douglas, speaking for the majority, wrote: "[W]e do not agree that the truth or verity of respondents’ religious doctrines or beliefs should have been submitted to the jury * * * the First Amendment precludes such a course * * * 'The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect’ * * * Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs.” (Supra, at 86.) "The religious views espoused by respondents might seem incredible, if not prepos *322 terous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.” (Supra, at 87.)
Despite the refusal to recognize a religious exception to a criminal law of general application as exemplified in Smith (supra), nothing therein would undermine the general principle, as outlined above, that the plausibility or reasonableness of someone else’s religious beliefs cannot be permitted.
The attempt in Smith (supra) to limit the broad reach of Sherbert v Verner (supra) met with intense criticism, and brought about the enactment of the Religious Freedom Restoration Act of 1993. (42 USC § 2000bb et seq.)
Congress, finding that the restriction engrafted by the Supreme Court in Smith (supra) "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion” (42 USC § 2000bb [a] [4]), and further finding that the compelling interest test as set forth in prior Federal court rulings was a workable test for striking sensible balances between religious liberty and "compelling prior governmental interests” enacted the Religious Freedom Restoration Act in order:
"(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
"(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.” (42 USC § 2000bb.)
The Act provides that government may substantially burden a person’s exercise of religion only upon a demonstration that application of the burden furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest. (42 USC § 2000bb-l.) Applicability of the Act is extended to all Federal and State law, whether statutory or otherwise not and whether adopted before or after November 16, 1993. (42 USC § 2000bb-3.)
Subsequent cases dealing with the imposition of burdens upon religious practice have either found that: (1) the absence of any demonstrated governmental interest in enforcement of the law or regulation imposing the burden (Western Presbyt. *323 Church v Board of Zoning Adj., 849 F Supp 77 [1994]); or (2) the burden imposed is not the least restrictive means to achieve the governmental goals sought (Campos v Coughlin, 854 F Supp 194 [1994]; see also, Allan v Menei, 844 F Supp 1056 [1994]; Rust v Clarke, 851 F Supp 377 [1994]).
A law or rule which may be neutral on its face may nevertheless have a negative or inhibiting effect on religion in its application. Thus, a law prohibiting all consumption of alcohol may impose a special burden on the use of sacramental wine in Catholic or Jewish rites, and without an exemption, the law of general application may in fact fail the test of religious neutrality. Our earlier prohibition law recognized this by providing an exemption for "wine for sacramental purposes”. The United States Supreme Court explicitly recognized that carving out a religious exemption would not unduly favor or "establish” any religion. "Such an accommodation [would] 'reflect * * * nothing more than the governmental obligation of neutrality in the face of religious differences.’ ” (Wisconsin v Yoder, supra, at 235, n 22.)
Mr. Justice Souter, in the 1993 case of Church of the Lukumi Babalu Aye (supra), aptly drew the distinction between "formal neutrality” and "substantive neutrality”. (508 US, at 561-562, supra [concurring opn].) If the application of a rule which is nondiscriminatory on its face does in fact inhibit the free exercise of certain religions, then true neutrality requires exceptions to be made for those particular cases.
STATE CASES ON MITIGATION AND RELIGION
Unlike unemployment compensation, compulsory education, and criminal cases, where the courts must weigh State interest as against individual religious exceptions, when it comes to the requirement of mitigation of damages, we are talking about the role of the State government and its instrumentalities as the enforcer and arbiter of private rights.
Despite the clear pronouncements of the Federal cases and statutes, which do not deal with the mitigation-religion conflict as such, defendants rely on a handful of earlier cases applying State law which use an "objective” standard applying the "duty to mitigate” rule to all plaintiffs regardless of their religious reservations, as contrasted with the "case-by-case” approach which takes into consideration the religious scruples of the particular plaintiff. (See, Note, Medical Care, Freedom of Religion, and Mitigation of Damages, 87 Yale LJ 1466 [1978]; Annotation, Refusal of Medical Treatment on Religious *324 Grounds as Affecting Right to Recover for Personal Injury or Death, 3 ALR5th 721 [1992].)
Heavy reliance is placed by defendants on such cases applying the "objective” standard as Munn v Agee (924 F2d 568 [5th Cir 1991]) and Corlett v Caserta (204 Ill App 3d 403, 562 NE2d 257 [1990]). In Munn v Agee, a wrongful death action was brought against a driver where a blood transfusion had been refused for the decedent during surgery. The court, applying Mississippi State law, recognized that the weighing by a jury of a reasonableness of religious beliefs would violate the establishment of religion clause, but opted for an "objective” approach which would ignore religious objections and require either mitigation or reduction of damages.
In Corlett v Caserta (supra), where death was caused by the refusal of a Jehovah’s Witness to accept blood transfusions, the court declined.to create any exemption from general tort principles based on the patient’s religious convictions. In Shorter v Drury (103 Wash 2d 645, 695 P2d 116 [1985], cert denied 474 US 827), a Jehovah’s Witness had refused blood transfusions, but a malpractice action against her doctor limited the recovery for wrongful death where she and her husband had given a release for the consequences of the refusal. Defendants here claim that the approved rejection by that trial court of a proposed charge that "compensation could not be denied because of a refusal of blood for religious reasons” (supra, 103 Wash 2d, at 658, 695 P2d, at 124) was virtually identical to the charge given by the court in this case. It is not, and the circumstances are totally different.
Moreover, this court disagrees with the assertion in the Shorter case (supra) that submission of the religion issue to the jury involved no State action, it being claimed as merely a dispute between private individuals. Certainly, when the mechanism of the State’s judicial machinery is brought into play, and a Judge instructs the jury as to the substantive law of the State, and the jury, as the designated fact finder in the State’s legal system, is called upon to decide the reasonableness or error of conduct motivated by deeply held religious beliefs, the State has taken action. It is the application of State law in such a way as to deny benefits which tends to create the coercive pressure to conform. (Montgomery v Board of Retirement, 33 Cal App 3d 447, 109 Cal Rptr 181 [1973].)
Even the "case by case” decisions are highly problematical for, as in Lange v Hoyt (114 Conn 590, 159 A 575 [1932]), when the jury is asked to consider a plaintiff’s religious beliefs, ask *325 ing the jury whether the damages reasonably could have been avoided leaves the soundness of the religious doctrine to jury analysis and vote.
It should now be abundantly clear, under Sherbert, Yoder (supra), and their progeny, as reaffirmed by the Religious Freedom Restoration Act, that "to condition the availability of benefits upon * * * [plaintiffs] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.” (Sherbert v Verner, 374 US, at 406, supra.)
Does the State of New York, in a lawsuit between private individuals, have a "compelling governmental interest” of the "highest order” in limiting damages awarded an injured plaintiff whose religious principles forbid certain medical procedures which may ameliorate the injuries she has suffered at the defendants’ hands? Is limiting full compensation' to the injured victim "the least restrictive means of furthering that compelling governmental interest”? (42 USC § 2000bb-l [b] [2].)
New York recognizes that when it comes to religious belief or practice, the State is constitutionally obligated to maintain principles of neutrality. It cannot promote, burden, or discriminate. It must leave people alone.
The right of a patient in New York to accept or reject medical treatment is enshrined in our law. It is well established in New York that a competent patient can refuse suggested medical treatments that run counter to her religious beliefs. (Matter of Storar, 52 NY2d 363.) This is a "fundamental common-law right * * * coextensive with the patient’s liberty interest protected by the due process clause of our State Constitution” and that right could be overcome only by a compelling State interest. (Rivers v Katz, 67 NY2d 485, 493.)
This right to an untrammeled choice for following one’s conscience in opting for or against a given course of medical treatment transcends even possible negative impact on others. (Matter of Fosmire v Nicoleau, 75 NY2d 218.) If a patient is not required to accept treatment to preclude the possibility of her minor child becoming an orphan, can the State declare that she nevertheless has an overriding duty to act for the benefit of a stranger? "[WJhen the State requires her to undergo treatment which violates her religious beliefs it interferes with her fundamental constitutional rights.” (Supra, at 234.) Requiring a court charge of an unswerving duty to act "reasonably” by all persons to mitigate in order to cushion a defendant from paying higher damages is not "a compelling State interest.” *326 What "compelling governmental interest” in the amount of tort recovery which is permitted one private individual against another outweighs the need to forbid any governmental agency from passing on the soundness or reasonableness of religious beliefs? There always remains an obligation of official neutrality.
By recognizing the special circumstances and conditions of one litigant, we may individualize justice. But, that creates no special preference. There is no "establishment” here, no recognition of the superiority of one religion over another.
DO WE TAKE THE PLAINTIFF AS WE FIND HER?
Defendants’ plaint is that they should not be required to bear the additional burden of compensating for additional damages because of the religious idiosyncracies of one plaintiff. It is her religious scruples which have maximized the damages here. They contend her damages should be measured in the same way as those of anybody else.
The law of New York calls for individualized, not standardized awards of damages. We recognize differences of status. The disability of a chief executive of a major corporation will call for more damages than that of a minimum-wage hamburger flipper. One with a longer life expectancy can be expected to recover more than an elderly, infirm person. Similar injuries may have disparate effects. That will depend on the preexisting condition of the person involved. In other words, we take the injured party as he or she is, not on the basis of some standard and hypothetical norm.
We sometimes make reference to the "egg-shell skull” doctrine — the fact that the person injured may be more fragile or more susceptible than most is a consequence the tortfeasor must accept, for it was his wrong which set off the train of injuries, unusual and unanticipated though they may be. The universally accepted doctrine is that if a person has a special condition or predisposition which results in greater than normal damages, the defendant remains legally responsible. (PJI 2:283; King v State of New York, 58 AD2d 934, 935.)
When we consider the condition of a plaintiff as she is, while it is true that the doctrine is generally construed in the light of preexisting physical or physiological conditions, it can also extend to latent mental instability and mind-sets, i.e., psychological conditions. There is no compelling reason (other than potential fraud) to draw the line there and hold that we may not consider other aspects of an individual persona. Conscience *327 and religious belief are not passing whims, but guide human beings to life and death decisions.
Religious conviction, upbringing and tradition may indeed be considered as playing a part in the governance of a person’s conduct. We are not dealing here with a person who for ephemeral, fleeting or whimsical reasons willfully or stupidly rejected a course of treatment which would ameliorate her condition. Her devout belief and unswerving conviction was the bedrock of her being. It was as much a part of her as her age, her gender, her physical constitution frail or robust, or her psyche.
It is not for Judges, jurors or any other agency of government to pass on her beliefs and pronounce them unsound. The sincerity of her beliefs was never challenged. She acted on those beliefs at the risk of her life, and endured the pain and torture of extended hospitalization, agonizing and protracted traction, badly knit bones, invalidism, and the sure knowledge that with asceptic necrosis setting in there will be complete helplessness for the rest of her life. She did all she could to speed her recovery, short of accepting forbidden blood transfusions. She took the course which her religion taught her was the best way to ultimate cure, that God’s will would prevail. It was not her religion which brought her condition about, but the direct consequence of the negligence and fault of the insured driver. She may not be penalized for her beliefs, and the defendants are no more unfairly burdened than if the fortuitously injured party had been a brain surgeon, a ballet dancer or fragile teenager.
In considering a verdict, if the damage enhancing effects of injury to an unbalanced and psychotic mind (a preexisting condition) are not to be ignored, with a jury taking into account the fears, the dreams and the hallucinations of such a person, how can we ignore the mind-set of a nonpsychotic person whose deeply ingrained set of beliefs motivate her life choices? An unfair burden is not imposed on the defendants. The law is and remains for defendants — you take the victims as they are, whatever their physical and mental condition, and whatever their prior training — vocational or religious. It is the essence of our unique constitutional guarantees of personhood that no one is to be discriminated against or penalized by reason of race, sex, or religion. There is no "compelling government interest” for a State court to alleviate the risk borne by the insurers, which would require it to rule otherwise.
I find however that the limits of reasonable compensation are $1,000,000 for plaintiff’s three years of intense pain and *328 suffering during and after hospitalization, and $2,750,000 for 15 years of future pain, suffering, disability and loss of enjoyment of life. A new trial will be directed on the issue of damages unless plaintiff stipulates to accept the verdict as so reduced.