# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| LARRY D. RILEY, | No. 47905-2-II |
| Appellant, | |
| v. | |
| IRON GATE SELF STORAGE; ESMS PARTNERS LP; GLEN L. ARONSON; EVE ARONSON TRUST; PRIME COMMERCIAL PROPERTY, INC.; all dba IRON GATE SELF STORAGE; dba IRON GATE STORAGE-CASCADE PARK, | PUBLISHED OPINION |
| Respondents. | |

MELNICK, J. — Larry Riley entered into a self-storage rental agreement with Iron Gate Self Storage that contained provisions limiting Iron Gate's liability and maximum recoverable damages. Riley appeals the trial court's order granting Iron Gate's partial summary judgment, denying his motion for reconsideration, and entering a final judgment of dismissal with prejudice. We conclude that the trial court properly granted summary judgment on the breach of contract and conversion claims. We further conclude that the limiting provisions in the rental agreement violated public policy under the Consumer Protection Act (CPA) but not under the Self-Service Storage Facilities Act (Storage Act). We affirm in part and reverse in part.

## FACTS

Iron Gate Storage—Cascade Park (Iron Gate) is a commercial business that rents storage space to the public. On December 1, 2003, Riley entered into a rental agreement with Iron Gate

to rent storage units. The agreement included a cap of approximately $5,000 on the value of personal property that may be stored in the unit. The applicable provision stated:

> 5. **USES AND COMPLIANCE WITH LAW** . . . Occupant may store personal property with substantially less or no aggregate value and nothing herein contained shall constitute or evidence, any agreement or administration by Operator that *the aggregate value of all suchpersonal* (sic) *property is, will be, or is expected to be, at or near $5,000*. **It Is specifically understood and agreed that Operator need not be concerned with the kind, quality, or value of personal property or other goods stored by Occupant in or about the Premises pursuant to this Rental Agreement.**

Clerk's Papers (CP) at 142 (italicized emphasis added).

Another provision in the rental agreement included a limitation on liability and a $5,000 cap on damages:

> 7. **LIMITATION OF OPERATOR'S LIABILITY; INDEMNITY**. Operator and Operators Agent shall not be liable to Occupant for any damage or lose (sic) to any person. Occupant or any property stored in, on or about the Premises . . . *arising from any cause whatsoever*, including but not limited to . . . active or passive acts, omissions or negligence of Operator or Operators Agents *[except from] Operator's fraud, willful injury or willful violation of law*. . . . Notwithstanding anything contained in this Rental Agreement, *In no event shall Operator or Operator's Agents be liable to Occupant In an amount In excess of $5,000* for any damage or lose (sic) to any person, Occupant, or any properly (sic) stored . . . *arising from any cause whatsoever, Including, but not limited to*, Operators Agents' active or passive acts, omissions or negligence.

CP at 143 (italicized emphasis added).

The agreement also included a clause that stated the occupant shall maintain an insurance policy covering at least 100 percent of the actual cash value of stored personal property. Riley elected to "self-insure (personally assume all risk of loss or damage)." CP at 143. He initialed his name in each section, indicating that he understood the terms of the agreement.

Over the course of his lease, Riley often fell behind on his rent payments. Iron Gate sent Riley past due notices in May, June, and July 2010. It sent a pre-lien notice to Riley on May 21. It then sent Riley a notice of cutting lock on June 24, followed by a certified notice of lien one week later.

On July 8, 2010, Iron Gate mailed Riley a notice of auction. Iron Gate believed its notices complied with Washington law; however, the Notice of Auction mistakenly contained an auction date that was less than the statutorily required 14 days from the date of the notice. The auction occurred on July 15 and the winning bidder paid less than $2,000 for items in Riley's unit. Riley contacted Iron Gate following the auction and received information that his property had been sold.

Two days after the auction, Riley delivered a letter to Iron Gate expressing his opposition to the auction sale and his belief that the notices were invalid. Riley also notified Iron Gate that he was prepared to pay any outstanding rent. The letter also requested that his property be restored to him.

Iron Gate recovered many auctioned items by repurchasing them from the winning bidder. In addition to the recovered items, Iron Gate continued to store Riley's remaining property at no cost until Riley retrieved it several months later.

In March 2015, Riley filed an amended complaint alleging that Iron Gate violated the Storage Act and the CPA. He alleged that he suffered actual damages in excess of $1.5 million and sought treble damages under the CPA. Riley also alleged that the rental agreement was a contract of adhesion and that its provisions were unconscionable. He further alleged breach of contract and conversion.

Iron Gate moved for summary judgment on Riley's claims and, in the alternative, partial summary judgment against any recovery of damages that exceeded $5,000. Iron Gate acknowledged it mistakenly violated the Storage Act, but stated that it took steps to recover Riley's property. It argued that Riley failed to follow the terms of the rental agreement and the amount of damages he sought was barred by the agreement.

At the hearing on the motion for summary judgment, the trial court deferred its ruling on the summary judgment motion.[1] It granted the partial summary judgment motion and orally ruled that even if Riley successfully brought a claim, he would be bound by the contractual limitation of $5,000 in damages.

Riley moved for reconsideration and the trial court denied the motion. With Riley's agreement, Iron Gate then tendered a $23,000 check to Riley to be held by his attorney pending the outcome of this appeal.[2] Per Iron Gate, this amount reflected the maximum damages for which it could be liable, trebled, and with interest on the trebling, because of the CPA claim.

The trial court entered an order on partial summary judgment and a final judgment of dismissal with prejudice. The final judgment reiterated that Riley's recoverable damages, under all of his causes of action, were limited to a maximum of $5,000. It further stated that the $23,000 check payment tendered to Riley represented "an amount of recoverable damages, plus interest" which was equal to or greater than what Riley could potentially recover at trial. CP at 308. Riley did not object to the form of the order or judgment.

Riley appeals.

---

[1] Iron Gate later withdrew this motion and agreed to proceed only on the partial summary judgment motion.

[2] The parties agreed that Riley's counsel would put the $23,000 check in an interest bearing account pending the outcome of this appeal.

ANALYSIS

I.    SUMMARY JUDGMENT

    A.    LEGAL PRINCIPLES

We review an order granting summary judgment de novo. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 271, 285 P.3d 854 (2012). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We construe all facts and their reasonable inferences in the light most favorable to the nonmoving party. *Loeffelholz*, 175 Wn.2d at 271.

A party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact. *Atherton Condo. Apt.–Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton*, 115 Wn.2d at 516. If the moving party satisfies its burden, the nonmoving party must set forth specific facts demonstrating that a material fact remains in dispute. *Loeffelholz*, 175 Wn.2d at 271. "[C]onclusory statements of fact will not suffice." *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 360, 753 P.2d 517 (1988).

Summary judgment is proper only if reasonable persons could reach but one conclusion from the evidence presented. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 708, 153 P.3d 846 (2007). We may affirm summary judgment on any ground supported by the record. *Blue Diamond Grp., Inc. v. KB Seattle 1, Inc.*, 163 Wn. App. 449, 453, 266 P.3d 881 (2011).

When interpreting contracts, we give words in a contract their ordinary, usual, and popular meaning, unless the contract in its entirety clearly demonstrates a contrary intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005). The contract is viewed as a whole, and particular language is interpreted in the context of other contract provisions. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014).

B.     SCOPE OF LIMITATION CLAUSE ON DAMAGES

Riley argues that the $5,000 cap on damages in the rental agreement does not apply to intentional torts, such as conversion. We disagree.

Riley focuses on the first part of paragraph 7 of the rental agreement, which states that Iron Gate will not be liable for any damages except for "willful injury or willful violation of law." CP at 143. But the $5,000 damages cap is contained in the second part of paragraph 7, which does not contain any exclusion for willful injury. Instead, the cap applies to damages "arising from any cause whatsoever, Including, but not limited to, Operators Agents' active or passive acts, omissions or negligence." CP at 143. Conversion is a cause of action involving damages "arising from any cause whatsoever." CP at 143. Therefore, the limitation clause imposing the $5,000 cap on damages applies to all of Riley's causes of action.

C.     THE LIMITING PROVISIONS ARE ENFORCEABLE

Riley argues that the limiting provisions in the rental agreement are unenforceable because they are ambiguous and violate public policy. We disagree.

"Under the principle of freedom to contract, parties are free to enter into, and courts are generally willing to enforce, contracts that do not contravene public policy." *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 176, 94 P.3d 945 (2004). The parties to a contract are

bound by its terms. *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 517, 210 P.3d 318 (2009). Courts do not have the power, under the guise of interpretation, to rewrite contracts which the parties have made for themselves. *Clements v. Olsen*, 46 Wn.2d 445, 448, 282 P.2d 266 (1955).

Exculpatory provisions are strictly construed. *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 490, 834 P.2d 6 (1992). They are enforceable unless they violate public policy, are inconspicuous, or involve liability for acts falling greatly below the standard established by law for the protection of others. *Scott*, 119 Wn.2d at 492. The third exception is generally referred to as the "gross negligence" standard. *See Conradt v. Four Star Promotions, Inc.*, 45 Wn. App. 847, 852, 728 P.2d 617 (1986).

### 1. THE LIMITING PROVISIONS DO NOT VIOLATE PUBLIC POLICY

Washington courts apply a six-factor balancing test to determine whether an exculpatory agreement violates public policy.[3] These factors come from *Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, which states that the more of the six factors that "appear in a given exculpatory agreement case, the more likely the agreement is to be declared invalid on public policy grounds." 110 Wn.2d 845, 852, 758 P.2d 968 (1988).

The test is whether: (1) the agreement concerns an endeavor of a type generally thought suitable for public regulations; (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members

---

[3] Washington courts seem to analyze contractual agreements involving "exculpatory" or "limiting" liability provisions for public policy violations using the same factors. *See Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, 110 Wn.2d 845, 851-55, 758 P.2d 968 (1988); *Vodopest v. MacGregor*, 128 Wn.2d 840, 845-48, 913 P.2d 779 (1996); *Chauvlier v. Booth Creek Ski Holdings, Inc.*, 109 Wn. App. 334, 340-43, 35 P.3d 383 (2001); *Boyce v. West*, 71 Wn. App. 657, 662-63, 862 P.2d 592 (1993). Riley seems to argue the contract clauses at issue are exculpatory provisions. Iron Gate does not concede the point, but asserts the provisions are valid as either limiting provisions or exculpatory provisions.

of the public; (3) such party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards; (4) because of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks the services; (5) in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; and (6) the person or property of members of the public seeking such services must be placed under the control of the furnisher, subject to the risk of carelessness on the part of the furnisher, its employees, or agents. *Boyce v. West*, 71 Wn. App. 657, 663-64, 862 P.2d 592 (1993) (citing *Wagenblast*, 110 Wn.2d at 851-55).

The limiting provisions in Riley's self-storage rental agreement weigh in favor of a majority of the factors listed above. First, as to public regulation, a self-storage facility is a highly regulated industry or service. It must comply with numerous statutory and regulatory requirements contained in the Storage Act. Ch. 19.150 RCW; WAC 308-56A-312.

Second, self-storage facilities are not an essential or necessary public service. "A common thread runs through those cases in which exculpatory agreements have been found to be void as against public policy . . . they are all essential public services—hospitals, housing, public utilities, and public education." *Shields v. Sta-Fit, Inc.*, 79 Wn. App. 584, 589, 903 P.2d 525 (1995) (footnotes omitted) (holding that health clubs contribute to people's health, but are not essential to the welfare of the state or its citizens).

Third, Iron Gate holds itself out by advertising to the general public as willing to rent units to any member of the public who seeks it.

Fourth, Iron Gate does not provide an essential service. Nor does it possess a decisive advantage of bargaining strength. Riley had the freedom to take his business elsewhere if he disagreed with the rental agreement's provisions.

Fifth, the agreement and limiting provisions within it did not create an adhesion contract. Iron Gate did not exercise a superior bargaining power. It provided Riley with an opportunity to pay additional reasonable fees and protect against Iron Gate's negligence. Riley could have opted to purchase insurance and protect 100 percent of the cash value of his property, but he declined to do so.

Sixth, Riley had exclusive control over his storage unit. Per the agreement, Riley placed his own lock on the unit. Iron Gate could only enter the unit with written notice, in the case of an emergency, or if Riley defaulted. The rental agreement, therefore, gave Riley exclusive control of his unit and it did not place him under the control of Iron Gate.

The analysis shows that the limiting provisions and rental agreement as a whole weigh in favor of the majority of the factors outlined above. We, therefore, conclude that the provisions do not violate public policy for self-storage rental agreements.[4]

---

[4] Additionally, the Storage Act does not bar contractual provisions that limit liability and damages. *See* RCW 19.150.140. A recent amendment to the Storage Act confirms this point. The amendment states that if a condition in the rental agreement specifies a limit on the value of property that may be stored, that limit is the maximum value of the stored property for purposes of the facility's liability only. RCW 19.150.170; LAWS OF 2015, ch. 13 § 5. The accompanying senate bill report seems to acknowledge that such limitations in rental agreements have existed and that the amendment serves to clarify the purpose of such limits. *See* CP at 41-43 (Senate Bill Report 5009, Jan. 26, 2015).

2. THE LIMITING PROVISIONS ARE CONSPICUOUS

Riley next argues that he did not unambiguously agree to store only $5,000 worth of property in the storage unit. He argues that the first part of the applicable contract provision states that he can store property with "substantially less or no aggregate value," and that the second part is not, on its face, a limitation on the value of property that can be stored because it is a "refusal to agree that the property is worth more than $5,000." Br. of Appellant at 25. We disagree.

When read as a whole, the provision limiting the value of items stored in each unit is clear and unambiguous. It states, in relevant part, "It is understood and agreed that Occupant may store personal property with substantially less or no aggregate value and . . . the aggregate value of all suchpersonal (sic) property is, will be, or is expected to be, at or near $5,000." CP at 142.

As to the provision limiting damages and liability, Riley argues that the provision is so poorly worded and "hampered by grammatical and punctuation errors" that it is impossible to make sense of what is written. Br. of Appellant at 19. He argues that the damage limitation provision does not expressly exclude willful injury which Riley asserts is expressly excluded in the liability limitation provision. Riley also infers that the reference to "any cause whatsoever" in the damages provision is "general," and we should rely on the "specific term," negligence. Br. of Appellant at 20.

When read as a whole, the provision limiting damages is clear, despite the existing grammatical errors. It states that "In no event" will Iron Gate be liable in an amount in excess of $5,000 "arising from any cause whatsoever, Including, but not limited to" Iron Gate's active or passive acts, omissions, or negligence. CP at 143. The plain language clearly limits damages arising from any cause, including willful and fraudulent conduct. We reject Riley's arguments.

### 3. THE LIMITING PROVISIONS DO NOT INVOLVE LIABILITY FOR GROSS NEGLIGENCE

Riley seems to argue that Iron Gate's acts fell "greatly below the standard established by law for the protection of others." Br. of Appellant at 31-32. However, Riley provides no evidence that Iron Gate's conduct amounted to *gross* negligence. "Evidence of negligence is not evidence of gross negligence; to raise an issue of gross negligence, there must be substantial evidence of serious negligence." *Boyce*, 71 Wn. App. at 665. "'Gross negligence' is 'negligence substantially and appreciably greater than ordinary negligence.'" *Johnson v. Spokane to Sandpoint, LLC*, 176 Wn. App. 453, 460, 309 P.3d 528 (2013) (quoting *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965)).

Riley read, understood, and signed the rental agreement with Iron Gate that unambiguously limited the value of his storage contents to approximately $5,000. However, Riley allegedly stored an excess of $1.5 million worth of property in the storage unit and opted to self-insure. Before the auction, Riley was in arrears for months and had been in arrears in the past. Iron Gate sent multiple notices alerting Riley that his account was past due. Iron Gate mailed a notice letter with an erroneous auction date and subsequently conducted an auction of Riley's property. Riley has not provided substantial evidence that Iron Gate's conduct amounted to gross negligence.

Riley also argues that Iron Gate was grossly negligent in failing to give proper lien and auction notices as required by the Storage Act. The evidence showed that Riley was in arrears for several months and that Iron Gate sent an auction notice with an erroneous auction date. After Iron Gate conducted the auction and was made aware of its mistake, it provided Riley with an opportunity to recover his property. Iron Gate also recovered much of Riley's property and stored it for free. Riley has not shown that Iron Gate acted in a grossly negligent manner and the record does not support such a conclusion.

We, therefore, conclude that there was no material issue of fact as to the limiting provisions and that they are enforceable because they are not contrary to public policy, they are conspicuous, and they do not involve liability for acts falling greatly below the gross negligence standard.

D.    IRON GATE DID NOT INTENTIONALLY OR WILLFULLY VIOLATE THE STORAGE ACT

Riley further argues that Iron Gate intentionally violated the Storage Act and cannot contractually exculpate itself from its intentional acts. Iron Gate argues that the Storage Act does not bar provisions that limit liability or damages, nor do the provisions violate public policy. It argues that Riley cannot show willful misconduct and the provisions should be enforced. We agree with Iron Gate.

RCW 19.150.060(c) states that an occupant's property may be sold to satisfy a lien after a specified date which is "not less than fourteen days" from the last date of sending the final lien sale of notice. It is undisputed that Iron Gate did not give Riley 14 days' notice. The record also supports Iron Gate's argument that the notice violation was a mistake and that Iron Gate took steps to remedy the mistake.

Riley, however, contends that Iron Gate intentionally violated the notice requirement. He argues that because Iron Gate elected to begin the foreclosure and auction process against his property despite having the option to pursue other remedies such as a suit for money damages, the conduct "can only be described as a willful choice and an intentional act." Br. of Appellant at 14. He contends that volitional acts are included in the definition of willful. However, volition alone is insufficient to support a finding of "willfulness." "Willful" requires a showing of actual intent to harm. *Zellmer v. Zellmer*, 164 Wn.2d 147, 155 n.2, 188 P.3d 497 (2008). The evidence does

12

not show that Iron Gate's conduct was willful. While the conduct was "volitional" because Iron Gate acted upon their mistake, a mistake in and of itself is insufficient to show willfulness or actual intent to harm. We conclude that no genuine dispute of material fact exists that Iron Gate did not intentionally or willfully violate the Storage Act.

Riley argues that it is against public policy for the limitation provisions to apply to Storage Act claims. As discussed above, the limiting provisions in the agreement are enforceable and not contrary to public policy. Riley does not provide evidence showing how the limiting provisions are contrary to public policy under the Storage Act. Nor is there a provision in the Storage Act barring contractual provisions limiting liability and damages. We conclude that it is not contrary to public policy for such provisions to apply to Storage Act claims.

E.      THE LIMITING PROVISIONS BAR RILEY'S CONVERSION CLAIM[5]

Riley next argues that Iron Gate committed conversion when it intentionally seized and sold his property. He argues that to recover for conversion, he need only show Iron Gate intended to sell the property and need not show motive or purpose. He further argues that liability should not be exculpated when conversion occurred due to Iron Gate's volitional act. We disagree.

---

[5] Riley argues his conversion claim at length under various theories. He argues that the provision limiting liability excludes intentional torts because "willful" implies only "volition action," and because "willful" is used interchangeably with "intentional." Br. of Appellant at 23. He contends that the "willful injury" is selling Riley's unit contents, and the "willful violation of law" is engaging in notice procedures that resulted in the sale of his property in violation of the Storage Act. Br. of Appellant at 22. He also argues that the provision does not pertain to intentional torts because it does not specify that intentional torts are excluded. However, the limiting provision is clear: liability is barred from "any cause whatsoever," except fraud and willful misconduct. CP at 143.

Riley's conversion claim fails because it is barred by the contractual provision limiting liability. Per the agreement, liability attaches only when damage or loss arises out of Iron Gate's fraudulent or willful misconduct. As such, the limitation provision is enforceable for torts involving deliberate or volitional conduct so long as there is no evidence of fraudulent or willful misconduct. Riley has not presented evidence showing that Iron Gate's conduct was willful misconduct or fraudulent. Because the limitation provisions are enforceable against such claims, we conclude that there are no genuine issues of material fact as to whether Riley's conversion claim survives.

F.     THE LIMITATION PROVISIONS VIOLATE PUBLIC POLICY AS TO RILEY'S CPA CLAIM

Riley argues that Iron Gate's lien notices and rental agreement violate the CPA and that the agreement's limiting provisions disclaiming liability under the CPA are void under public policy. We conclude that the limitation provisions violate public policy because they seriously impair Riley from asserting a CPA claim, contrary to the purpose of the CPA's private right of action.

The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. The purpose of the CPA is to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts in order to protect the public and foster fair and honest competition. RCW 19.86.920. To achieve its purpose, the CPA is "liberally construed that its beneficial purposes may be served." RCW 19.86.920.

The CPA was amended to provide a private right of action, encouraging individual citizens to bring suit to enforce the CPA. *Dix v. ICT Grp., Inc.*, 160 Wn.2d 826, 836, 161 P.3d 1016 (2007). "The private right of action to enforce RCW 19.86.020 is more than a means for vindicating the

14

rights of the individual plaintiff" as the plaintiff must show that the challenged conduct affects the public interest. *Dix*, 160 Wn.2d at 837.

The CPA encourages individuals to fight restraints of trade, unfair competition, and unfair, deceptive, and fraudulent conduct. *Dix*, 160 Wn.2d at 840. Barring Riley from bringing a CPA claim due to the limitation provisions of his rental agreement contradicts the purpose of the CPA's private right of action. Further, CPA treble damages are capped at $25,000[6] while the limitation provisions cap Riley's damages to $5,000 as to all claims. Without deciding whether or not Riley's CPA claim survives summary judgment, we, therefore, conclude that a limitation provision that seriously impairs a plaintiff from asserting a private CPA claim violates public policy.

G.    THE LIMITATION PROVISIONS ARE NOT UNCONSCIONABLE

Riley argues that the agreement's exculpatory provisions are void because limiting liability for intentional and wrongful seizure and sale of his property worth over $1.5 million is unconscionable. We disagree.

1.    PROCEDURAL UNCONSCIONABILITY

Procedural unconscionability requires evidence of blatant unfairness in the bargaining process and a lack of meaningful choice. *Torgerson*, 166 Wn.2d at 518. Procedural unconscionability is determined in light of the totality of the circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms, and (3) whether the terms were hidden in a maze of fine print. *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 391, 858 P.2d 245 (1993) (citing *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 260, 544 P.2d 20 (1975)).

---

[6] The cap for CPA treble damages is $25,000. RCW 19.86.090. Therefore, contrary to Iron Gate's argument and the trial court's finding, the $23,000 initially tendered to Riley is not the same as an award of damages equal to or greater than what Riley could have potentially recovered at trial.

These factors should not be applied mechanically without regard to whether in truth a meaningful choice existed. *Torgerson*, 166 Wn.2d at 519.

Riley entered into the rental agreement with Iron Gate by choice and had a reasonable opportunity to understand the terms. Riley seems to argue that he did not have such an opportunity because he signed the agreement after a night of driving from California to Washington. This argument is meritless. Riley entered into the agreement with Iron Gate in 2003 and did not raise any issue as to its clarity or meaning until 2015. Riley testified that he understood the agreement. He placed his initials beside each limiting provision and signed the agreement, confirming that he understood its terms.

Further, the terms of the agreement were clear. As both parties acknowledged, the rental agreement contained numerous typographical errors. However, there was no evidence presented showing that the typographical errors confused the meaning of the contract or the provisions limiting liability, the value of the unit's contents, or recoverable damages. The limitation provisions, especially when read as a whole, were unambiguous in its meaning. We, therefore, conclude that the trial court did not err because there was no genuine issue of material fact regarding procedural unconscionability.

2.    SUBSTANTIVE UNCONSCIONABILITY

Substantive unconscionability involves cases where a clause or term in the contract is one-sided or overly harsh. *Torgerson*, 166 Wn.2d at 519. However, such unfairness must truly stand out; "shocking to the conscience," "monstrously harsh," and "exceedingly calloused" are terms sometimes used to describe substantive unconscionability. *Torgerson*, 166 Wn.2d at 519 (internal citations omitted).

Riley contends that the agreement's exculpatory terms were "monstrously harsh" and "shocking" because it allowed Iron Gate to auction an alleged $1.5 million of his property without following correct procedure, and because liability was limited to $5,000. Br. of Appellant at 44-45. Riley provides no evidence to support this contention. The agreement stated that the contents of his unit was expected to be valued at approximately $5,000. Further, the limitation on damages was clear and not overly harsh when it capped damages at $5,000—the total dollar amount Riley contractually agreed to keep in the unit. Riley agreed to the value limitation when he initialed his name beside the provision. Iron Gate relied on Riley's representation that the contents of his unit were valued at approximately $5,000. When read as a whole, the limitation provisions were not one-sided or overly harsh. We, therefore, conclude that the trial court did not err because there was no genuine issue of material fact as to substantive unconscionability.

H.      THE RENTAL AGREEMENT IS NOT AN ADHESION CONTRACT

Riley argues that the agreement is an adhesion contract because it does not contemplate insuring against illegal seizure and sale of storage unit contents. We disagree.

An adhesion contract exists if (1) the "'contract is a standard form printed contract,'" (2) the contract is "'prepared by one party and submitted to the other on a "take it or leave it" basis,'" and (3) there was "'no true equality of bargaining power between the parties.'" *Zuver v. Airtouch Commc's, Inc.*, 153 Wn.2d 293, 304, 103 P.3d 753 (2004) (quoting *Yakima County (W. Valley Fire Prot. Dist. No. 12*, 122 Wn.2d at 393) (quoting *Standard Oil Co. of California v. Perkins*, 347 F.2d 379. 383 n.5 (9th Cir. 1965))).

Iron Gate prepared the rental agreement, but the agreement gave Riley the option of purchasing insurance. *See Eifler v. Shurgard Capital Mgmt. Grp.*, 71 Wn. App. 684, 694, 861 P.2d 1071 (1993) (limiting provision did not violate public policy because plaintiff was given the

opportunity to purchase insurance). Riley agreed to the liability and damage limitations that were set out in the agreement. To offset the limitation provisions and protect his property, he was also provided an opportunity to purchase insurance through Iron Gate. Riley chose to self-insure and assume the risk instead. Riley also had the choice to take his business elsewhere if he disagreed with the agreement. We, therefore, conclude that the agreement was not an adhesion contract, and the trial court did not err because there was no genuine issue of material fact.

II.     MOTION FOR RECONSIDERATION

Lastly, Riley assigns error to the trial court's order denying his motion for reconsideration. We do not consider the issue because it is inadequately briefed.

Under RAP 10.3(a)(4) and (6), an appellant's brief must include "assignments of error, arguments supporting the issues presented for review, and citations to legal authority" and references to relevant parts of the record. *Bercier v. Kiga*, 127 Wn. App. 809, 824, 103 P.3d 232 (2004). If an appellant's brief does not include argument or authority to support its assignment of error, the assignment of error is waived. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986). "We need not consider arguments that are not developed in the briefs and for which a party has not cited authority." *Kiga*, 127 Wn. App. at 824.

Riley does not present any argument as to how the trial court abused its discretion when it denied his motion for reconsideration. Presumably, Riley is objecting to the court's decision for the same reasons he objects to the court's partial summary judgment ruling. However, we do not consider issues that are unsupported by argument and legal authority. Because Riley waived the issue by providing no argument or authority to support his assignment of error, we do not consider the issue.

Because we uphold the cap on damages to all claims, except as to the CPA claim, we affirm in part and reverse in part.

_Melnick, J._

Melnick, J.

We concur:

_Johanson, J._

Johanson, J.

_Maxa, A.C.J._

Maxa, A.C.J.