IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Parentage and Custody of: | ) | |
| T.B.M., | ) | No. 37396-7-III |
| | ) | |
| CATHERINE SPRING, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) | |
| | ) | |
| CHRISTINA SPRING | ) | |
| JUSTIN MANSON, | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, J. — Grandmother Catherine Spring prevailed in her petition to be declared de facto parent of her grandson, Theodore, a pseudonym. Catherine, nevertheless, appeals the court's limitation of her visitation rights now that she is de facto parent. We affirm the trial court.

FACTS

Christina Spring and Justin Manson are the respective mother and father of Theodore. Catherine Spring is the mother of Christina and grandmother of Theodore.

The disputants are grandmother Catherine and father Manson.

Justin Manson and Christina Spring married in 2007. On October 18 of the same year, Christina bore Theodore. After Theodore turned five months old, grandmother Catherine began weekly contact with him. In 2011, mother Christina and Manson separated and, in that year, Christina became pregnant by Robert Jenkins. One month before Christina gave birth to a daughter Karen, a pseudonym, Christina and Manson reconciled and again resided together with Theodore. During the next three years, grandmother Catherine cared for Theodore four to five days per week. Later, Christina bore interloper Robert Jenkins another child, Kathy, a fictitious name. Kathy was born with a rare form of epilepsy, Dravet Syndrome.

In January 2015, Justin Manson, Christina Spring, Theodore, Karen, and Kathy moved into Catherine Spring's home. Grandmother Catherine cared for Theodore. On September 11, 2015, Christina left Washington State with her daughters and Robert Jenkins and moved to North Carolina. Theodore remained in Washington with grandmother Catherine and his father.

In November 2015, North Carolina children authorities removed Karen and Kathy from Christina Spring and Robert Jenkins. Christina and Jenkins had ceased administering epilepsy medications to Kathy. Kathy's health worsened such that she needed constant care. Catherine Spring blames Justin Manson and Christina for the cessation of medication. Manson alleges he played no role in the predicament, but he

does not volunteer what steps he took to restore the medications. According to Christina, someone stole Kathy's epileptic medication.

In November 2015, Justin Manson attempted to retrieve Karen and Kathy from North Carolina and ferry them to Washington State. Due to his lack of paternity, North Carolina Child Protective Services terminated his rights as the two girls's presumed father.

In November 2015, Justin Manson moved from Catherine Spring's residence. Theodore continued to reside with grandmother, Catherine.

In August 2016, Catherine Spring sought custody of granddaughters, Karen and Kathy. Grandmother Catherine shortly learned of the extensive care required for Kathy and proceeded only to gain custody of Karen. A North Carolina couple adopted Kathy. Christina and daughter Karen returned to Washington, reunited with Justin Manson, and the trio lived in a trailer on grandmother Catherine's property. Christina and Manson left Catherine's property in January 2017. When they departed, the couple left Theodore and Karen in the care of their grandmother Catherine.

From 2015 to 2018, Theodore resided solely with Catherine Spring and Karen. Catherine enrolled Theodore in Chattaroy Elementary School. Catherine accompanied Theodore to the physician's office with Justin Manson's and Christina Spring's written consent. Catherine attended Theodore's dentist appointments, school conferences, field trips, and extracurricular activities. During this three year window of time, Manson

visited Theodore and Karen at Catherine's domicile every Sunday and Monday afternoon. In March 2018, grandmother Catherine Spring adopted Karen.

In July 2018, Justin Manson and Christina Spring petitioned for dissolution of their marriage. The two agreed on a parenting plan for their son, Theodore. On July 2, 2018, Manson removed Theodore from grandmother Catherine's home. Manson informed Catherine of his intent to procure custody of Theodore. On July 3, Catherine Spring filed a petition for nonparental custody of Theodore. On August 14, 2018, grandmother Catherine and Manson agreed to transition Theodore to Manson's care. The superior court dismissed Catherine's nonparental custody action.

PROCEDURE

On September 6, 2018, Catherine Spring filed this petition seeking de facto parentage of Theodore. Grandmother Catherine also filed a proposed parenting plan, which sought to establish her as Theodore's custodial parent and grant Justin Manson visitation every other weekend. Catherine's plan proposed that mother Christina Spring receive one daytime visit per month.

On October 19, 2018, the parentage court ruled that adequate cause existed for grandmother Catherine Spring's de facto parentage case to proceed. On October 30, 2018, the dissolution court entered Justin Manson's and Christina Spring's final parenting plan. The plan established Manson as Theodore's custodial parent and granted Christina visitation with Theodore every other weekend.

On November 1, 2018, the parentage court appointed Karen Vache as Theodore's guardian ad litem for purposes of the de facto parentage petition. On February 5, 2019, the court denied grandmother Catherine Spring's motion for temporary visitation with Theodore. The court later granted Catherine visitation with Theodore for one Sunday per month for July, August, and September 2019, from 9:00 a.m. to 8:00 p.m.

During the pendency of this de facto parentage action, Guardian ad litem Karen Vache visited Theodore on three occasions, for a total of approximately one and one-half hours. Vache concluded that grandmother Catherine Spring had performed consistent caretaking of Theodore over the years. The grandmother deemed herself permanent caretaker for the boy. Vache believed that Catherine introduced Theodore as her child, despite Theodore calling her "grandma." Report of Proceedings (RP) at 46. Theodore expressed an adamant wish to live with his father, rather than with his grandmother.

According to Justin Manson's fiancé, Stacey Mullins, grandmother Catherine Spring offered her $10,000 to testify on her behalf and "lie to the court." RP at 277. Mullins disclosed that Catherine impersonated her in order to obtain Theodore's school records. Mullins received Theodore's school records, which were addressed to Manson, and grandmother Catherine requested that Mullins turn the records over to her.

During trial testimony, Karen Vache opined that Catherine Spring maintained a grandmother-grandchild relationship with Theodore, and Catherine lacked a bonded and dependent mother-son relationship with the minor. Vache concluded that Catherine's and

5

Theodore's continuing relationship would not further the child's best interest. After

reviewing e-mail messages between Catherine Spring and Theodore, Karen Vache

determined that grandmother Catherine thwarted Justin Manson's and Christina Spring's

efforts to have contact with Theodore. Vache also concluded that neither parent regularly

visited with Theodore when Catherine possessed custody. Vache expressed concerns

about Catherine inserting Theodore into the court proceedings and directing the grandson

to choose sides between his grandmother and his parents. When Theodore spoke with his

grandmother by phone at his father's house, the father on occasion terminated the

conversation because of Catherine's insistence that Theodore reside with her. According

to Vache, Theodore exhibited distress from being asked to choose a location. Karen

Vache averred that Theodore performed well with the schedule established in his parents'

parenting plan.

In a final written report, Karen Vache recommended that the court: (1) dismiss

Catherine Spring's de facto parentage action, because continued placement with

grandmother Catherine is not in Theodore's best interest, (2) Theodore should reside

primarily with Manson, (3) mother Christina Spring should be granted visitation every

other weekend, and (4) grandmother Catherine should be granted visitation one weekend

per month.

During trial, Catherine Spring testified that Justin Manson abducted Theodore

from her care. She labeled Manson as abusive and neglectful of Theodore. Grandmother

Catherine accused Manson of drug addiction. According to Catherine, the parents Christina Spring and Justin Manson lived in filth with feces on beds. Grandmother Catherine conceded, however, she had not visited Manson's recent dwelling.

After a two-day bench trial, the parentage court issued an oral ruling. The court reviewed the requisite factors to adjudicating a claim of de facto parentage pursuant to RCW 26.26A.440(4). The court found that Theodore resided in Catherine Spring's household for a significant period of time and that grandmother Catherine engaged in consistent caretaking of Theodore. The court found that, although Theodore's parents provided Catherine some financial support to raise Theodore, Catherine undertook full and permanent parental responsibilities without expectation of financial compensation. The parentage court concluded that, although Theodore referred to Catherine as "'grandma,'" Catherine still identified Theodore as her own child. RP at 389-90. The court concluded that Catherine established a bonded and dependent parental relationship with Theodore.

The parentage court deemed the continued parental-child relationship between grandmother Catherine Spring and Theodore to conflict with Theodore's best interest. The court commented:

> The final factor is frankly the biggest factor here, and where, again, besides timing, where most of the testimony circled around, and that is, under the statute [RCW 26.26A.440(4)], factor G, the continuing relationship between the individual and the child is in the best interest of the child. *That one concerns me*.

The guardian ad litem testified that [*Theodore*] *became anxious when talking about grandma putting him into the middle of the dispute that the parents have with grandma*.  The information or the evidence that was proffered to this Court was that grandma was requesting [Theodore] choose between her and his parents, and that was done through texts, a text stream.  Now, Catherine Spring does deny making [Theodore] choose, however, there is some evidence that would support that this occurred in some fashion causing anxiety to [Theodore.]

*The bigger concern here is how these parties are going to parent together*, and the history of this action shows that each party's, I suppose interests or decision to hunker down into litigation, has made them make parenting decisions which are not in the best interest of the children that are in their care.

RP at 391-92 (emphasis added).  The court questioned Theodore's parents' decision to

excise Catherine completely from Theodore's life between December 2018 and July

2019.  The trial court continued:

Dad did testify that he doesn't trust grandma, that she would say negative things and put [Theodore] in the middle.  *That is a legitimate concern.  This is not the child's business, nor his responsibility to choose who to live with*.

RP at 392 (emphasis added).  The parentage court also expressed concern with

grandmother Catherine's decision to sever contact between Theodore and Karen:

Not allowing those two siblings to see each other or to have contact on her [Catherine's] terms only is not appropriate.  In other words, you don't get Karen if I don't get [Theodore], that's not how it works, at least not from my perspective.

RP at 393.

The best interest of the child is the major factor here for this Court, and I will be honest, it's one that I struggled with because *I don't really see the parenting between the three parents as healthy at all for this child.  The*

> *guardian ad litem, in her investigation, indicates and discussed the anxiety that [Theodore] demonstrated. She also indicated that he was adamant about not living with grandma.* He wants to live with dad and wants to visit regularly with mom and he would like to see grandma maybe once a month.

RP at 395 (emphasis added).

> Now, there is a significant relationship that [Theodore] had with his grandma and her role in his life and cutting her out of his life is not in his best interests, but certainly, [Theodore] is not the one that should be making that decision, which is obviously why we're here. *I also don't find that regular and consistent monthly visits with grandma are in [Theodore's] best interest given the evidence presented at trial.*
> *He's in school, he needs to concentrate in school. He has two parents that are participating in his life.*

RP at 397 (emphasis added).

The parentage court entered findings of fact and conclusions of law. The court determined that grandmother Catherine Spring is Theodore's de facto parent. Nevertheless, the court found that Justin Manson will have primary placement of Theodore under the best interest standard. The court granted Catherine residential time with Theodore four days per year from 9:00 a.m. to 8:00 p.m.: one Sunday during Theodore's winter break and one Sunday per month in the summer.

## LAW AND ANALYSIS

On appeal, grandmother Catherine Spring contends the parentage court breached its discretion when severely limiting her visitation with Theodore after declaring her to be de facto parent of the boy. She requests this court reverse the trial court's order and allow for at least monthly visitation. The parties do not dispute on appeal whether

9

Catherine Spring is Theodore's de facto parent, only the amount of residential time

consistent with Theodore's best interest.

We decline to address the merits of Catherine's appeal for two reasons. First, she

assigns no error to the parentage court's ruling. Second, Catherine fails to adequately

brief issues raised by the court's ruling in light of the court's wide factfinding discretion

in family law matters.

In violation of a court rule, Catherine Spring fails to assign error to any of the

parentage court's rulings. RAP 10.3(a)(4). A failure to assign error to the court's

decision waives any argument. *Jackson v. Quality Loan Service Corp.*, 186 Wn. App.

838, 846, 347 P.3d 487 (2015). We may exercise discretion to review the appeal if,

despite no assignment of error, the court can adequately address the arguments raised.

*Richardson v. Department of Labor & Industries*, 6 Wn. App. 2d 896, 904-05, 432 P.3d

841 (2018) *review denied*, 193 Wn.2d 1009, 439 P.3d 1069 (2019). We decline this

discretion because of a lack of informed briefing in support of Catherine's appeal.

RCW 26.26A.440 governs the adjudication of a de facto parentage claim. The

statute states, in relevant part:

> (4) In a proceeding to adjudicate parentage of an individual who
> claims to be a de facto parent of the child, the court shall adjudicate the
> individual who claims to be a de facto parent to be a parent of the child if
> the individual demonstrates by a preponderance of the evidence that:
> (a) The individual resided with the child as a regular member of the
> child's household for a significant period;
> (b) The individual engaged in consistent caretaking of the child;

(c) The individual undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation;

(d) The individual held out the child as the individual's child;

(e) The individual established a bonded and dependent relationship with the child which is parental in nature;

(f) Another parent of the child fostered or supported the bonded and dependent relationship required under (e) of this subsection; and

(g) Continuing the relationship between the individual and the child is in the best interest of the child.

The parentage court found that Catherine Spring fulfilled these six elements of the statutory test.

RCW 26.26A.440 and related statutes do not expressly direct any steps to be taken by the parentage court after declaring the petitioner to be a de facto parent. Presumably, the court decides residential placement of the child as between the de facto parent and other parents and affords visitation rights to the noncustodial parent or parents. But no statute lists factors for weighing or imposes any standards for the extent or scope of visitation.

Catherine Spring contends that, once the parentage court declared her a de facto parent, the court needed to assess the extent to which her contact with Theodore would serve the child's best interest. She cites RCW 26.26A.440(4)(g) for this proposition, but the statutory subsection only mentions a best interest standard for purposes of whether to declare de facto parentage, not the extent of the relationship thereafter. Assuming we adopted a general best interest standard we would affirm the parentage court because the court did not abuse its discretion when limiting visitation. Ample facts established that

11

grandmother Catherine's interaction with Theodore interfered in Justin Manson's raising

of his son.

A principle emanating from de facto parentage law is that one who meets the

rigorous test that defines a de facto parent stands in legal parity to an otherwise legal

parent and, therefore, receives the same parental rights and responsibilities. *In re*

*Parentage of J.A.B.*, 146 Wn. App. 417, 426, 191 P.3d 71 (2008). One could conclude

that the parentage court, based on this vague principle, should afford, under the

permanent parenting plan, the de facto parent the same visitation rights awarded a

noncustodial parent during a marital dissolution proceeding. In turn, under RCW

26.09.187(3)(a) the court would make "residential provisions for each child which

encourage each parent to maintain a loving, stable, and nurturing relationship with the

child, consistent with the child's developmental level." The parentage court might be

precluded from limiting liberal visitation rights under RCW 26.09.191 unless the court

found that the de facto parent engaged in abandonment, abuse, or domestic violence. But

no statute or case law stands for affording the de facto parent the same plentiful visitation

rights afforded biological parents. Nor does Catherine Spring provide a reasoned

analysis to resolve this unanswered question.

The Washington Supreme Court wrote in *In re Parentage of L.B.*, 155 Wn.2d 679,

708-09, 122 P.3d 161 (2005): "A de facto parent is not entitled to any parental privileges,

as a matter of right, but only as is determined to be in the best interests of the child at the

center of any such dispute." This principle conflicts with granting the de facto parent parity with the biological parent when determining visitation with the child.

Because RCW 26.26A.440 does not define "best interest of the child" for purposes of a limitation of visitation rights in a de facto parent, Catherine Spring asks this court to consider RCW 26.11.040 for insight. Nevertheless, RCW 26.11.040(4) contains a list of nonexclusive factors for determining whether a nonparental petitioner's visitation serves the best interest of a child, not for purposes of a de facto parent. If Catherine Spring had filed a visitation petition, she could not succeed unless the parentage court found that Theodore would be exposed to a substantial risk of harm without visitation before implementing the best interest standard. Spring provides no analysis as to why the factors found in RCW 26.11.040 should apply to a de facto parent.

If an appellant's brief does not include argument or authority to support its assignment of error, the assignment of error is waived. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986). We need not consider arguments that are not developed in the briefs and for which a party has not cited authority. *Riley v. Iron Gate Self Storage*, 198 Wn. App. 692, 713, 395 P.3d 1059 (2017).

CONCLUSION

We affirm the parentage court's visitation ruling.

13

No. 37396-7-III
*Spring v. Spring*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Lawrence-Berrey, J.